## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MAX WEISMAN,                               :
   Plaintiff                 :
                                        :   CIVIL ACTION NO. 04-cv-4719
    vs.                 :
                                        :   JURY TRIAL DEMANDED
BUCKINGHAM TOWNSHIP;                        :
BUCKINGHAM TOWNSHIP BOARD                   :
OF SUPERVISORS; RAYMOND                     :
STEPNOSKI, HENRY ROWAN; and                 :
JANET FRENCH,                               :
   Defendants                :
                                        :

### ORDER

**AND NOW**, this _____ day of _____, 2006, upon consideration of the Motion for Partial Summary Judgment of the Plaintiff, Max Weisman, and any response thereto, it is hereby **ORDERED** and **DECREED** that said Motion is granted, that Judgment is entered in favor of the Plaintiff on Counts III, V, VII and X of the Plaintiff's Amended Complaint, and that Judgment is entered against the Defendants on these Counts.

It is specifically **ORDERED** that judgment be entered on behalf of the Plaintiff on the following Counts of Plaintiff's Amended Complaint:

    1.    Counts III and V of Plaintiff's Amended Complaint, alleging, respectively, violation of the Americans with Disabilities Act and the Pennsylvania Human Relations Act against all Defendants based on discrimination;

    2.    Count VII of Plaintiff's Amended Complaint, alleging breach of contract and/or promissory estoppel against Defendant Buckingham Township; and

3.      Count X of Plaintiff's Amended Complaint, alleging violation of the Second Class Township Code against all Defendants.

It is further **ORDERED** that the Plaintiff is reinstated as Township Manager of Buckingham Township, Bucks County, Pennsylvania, effective the date of this Order. A jury trial shall be held on the remaining Counts and claims contained in Plaintiff's Amended Complaint and the issue of the amount of compensatory and punitive damages that shall be awarded to the Plaintiff.

BY THE COURT:

_____

**J. Curtis Joyner, J.**

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAX WEISMAN,<br>    Plaintiff | :<br>:<br>:    CIVIL ACTION NO. 04-cv-4719 |
| vs. | :<br>:    JURY TRIAL DEMANDED |
| BUCKINGHAM TOWNSHIP;<br>BUCKINGHAM TOWNSHIP BOARD<br>OF SUPERVISORS; RAYMOND<br>STEPNOSKI, HENRY ROWAN; and<br>JANET FRENCH,<br>    Defendants | :<br>:<br>:<br>:<br>:<br>: |

## MOTION FOR PARTIAL SUMMARY JUDGMENT OF PLAINTIFF, MAX WEISMAN

Plaintiff, Max Weisman, by and through undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves this Honorable Court for Partial Summary Judgment on Counts III, V, VII and X of the Plaintiff's Amended Complaint in the above-captioned action as further set forth in the attached Memorandum of Law.

Respectfully submitted,
LEVIN LEGAL GROUP, P.C.

Michael I. Levin, Esquire
Stacy G. Smith, Esquire
Joshua B. Axelrod, Esquire
1301 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
(215) 938-6378
*Counsel for Plaintiff*

Dated: 8/16/06

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

MAX WEISMAN,                   :
   Plaintiff                :
                             :   CIVIL ACTION NO. 04-cv-4719
   vs.                  :
                             :   JURY TRIAL DEMANDED
BUCKINGHAM TOWNSHIP;     :
BUCKINGHAM TOWNSHIP BOARD  :
OF SUPERVISORS; RAYMOND   :
STEPNOSKI, HENRY ROWAN; and :
JANET FRENCH,           :
   Defendants            :
                             :

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Max I. Weisman (hereinafter "Weisman") contends that he is entitled to

Partial Summary Judgment regarding the following counts and claims in Plaintiff's

Amended Complaint.

    1.      Weisman moves for Partial Summary Judgment on Counts III and V of

Plaintiff's Amended Complaint, alleging, respectively, violation of the Americans with

Disabilities Act (hereinafter "ADA") and the Pennsylvania Human Relations Act

(hereinafter "PHRA") against all Defendants[1] based on unlawful discrimination. The

Defendants violated the ADA and PHRA by discharging him because of his disability, by

failing to engage in the interactive process required by the ADA and PHRA, and by

---

[1] The Defendants are Buckingham Township (hereinafter "Township"), Buckingham Township Board of Supervisors (hereinafter "Board" or "Supervisors"), and 2002-2003 Board members, Chairman Raymond Stepnoski (hereinafter "Stepnoski"), Henry Rowan (hereinafter "Rowan") and Janet French (hereinafter "French").

failing to provide reasonable accommodations.[2]  Had the Defendants engaged in the interactive process in good faith, Weisman would have been able to return to work with reasonable accommodations and would not have been summarily discharged at the end of February, 2003.  It is undisputed that Weisman was disabled when he was discharged and that the Defendants failed to engage in the interactive process or to attempt to reasonably accommodate his disability.

2.    Weisman moves for Partial Summary Judgment on Count VII of Plaintiff's Amended Complaint, alleging breach of contract and/or promissory estoppel against the Defendant Township.  Weisman negotiated an employment agreement and a severance agreement with the Township, consistent with the Township Ordinance requiring an employment contract with a Township Manager, and was told by the Board that these agreements were acceptable to and agreed upon by it.  Weisman was assured by the Township solicitor that these agreements would be signed by the Board in due course.  Weisman accepted the position of Township Manager, and declined to continue his employment as the Township Finance Director or seek other employment opportunities, based on and in reliance upon these representations.  Weisman held the position of Township Manager for almost three years, from July 2000 through his unlawful termination effective March 1, 2003, based on these assurances.

The Defendants should have reasonably known that their assertions regarding acceptance of the employment and severance agreements would be relied upon by

---

[2] Weisman is not abandoning the other aspects of his discrimination claims under the ADA or PHRA as set forth in the Amended Complaint. Weisman merely moves for Partial Summary Judgment on Defendants' discriminatory failure to engage in the interactive process, unlawful discharge of Weisman, and failure to provide reasonable accommodations, as there are no material facts in dispute concerning those aspects by Weisman's claim.

Weisman. After Weisman was officially appointed to the position of Township Manager in July of 2000, all conditions of his employment contract were put into place. In December of 2002, Weisman informed the Township that he was disabled and requested that the Township fulfill its obligations under his employment contract and compensate him under the short-term disability provisions of his contract. The Defendants responded by denying that any employment contracts existed and failing to pay Weisman any disability benefits as had been promised. Moreover, when the Township fired him, the Township refused to compensate Weisman in accordance with the severance agreement.

The Supervisors, as developed during discovery, now claim that they have no information or recollection regarding the negotiations concerning Weisman's acceptance of the Township Manager position or the agreements the Board entered into with Weisman. The Supervisors cannot and do not deny or dispute Weisman's recollection of events concerning the employment contract or severance agreement. Therefore, there is no dispute of fact concerning Weisman's assertions that the Defendants breached the employment and severance agreements.

3.     Weisman moves for Partial Summary Judgment on Count X of Plaintiff's Amended Complaint, alleging violation of the Second Class Township Code against all Defendants. The Defendants admit that the Township is organized and governed under Pennsylvania law by the Second Class Township Code. The Second Class Township Code indicates that an affirmative vote of a majority of the entire Board at a public meeting is necessary in order to transact any business. The Township has admitted, and the Township's public meeting minutes reveal, that the termination of Weisman's employment was not accomplished by an affirmative vote of the majority of members of

the Board at a public meeting. Weisman's discharge was thus invalid pursuant to the Second Class Township Code, and reinstatement of Weisman as Township Manager, together with back pay, is required as a matter of law.

Each of these arguments will be addressed seriatum.

## BACKGROUND

In September of 1998, Weisman began working for Buckingham Township as the Township's Finance Director. (Exhibit "P-112"[3], page 26, lines 9-12; Exhibit "P-187", ¶ 13). Weisman's work performance was exemplary from the day he began working for the Township. (Exhibit "P-119", Part 2, page 62, line 5 to page 63, line 11; page 63, lines 18-21; page 65, lines 17-25; page 66, lines 16-22; page 67, line 8 to page 68, line 17; Exhibit "P-187", ¶ 54). In this position, Weisman initially worked 60 to 65 hours per week, and on average, he worked between 50 and 60 hours per week during the period of time he held this position. (Exhibit "P-112", page 27, lines 13-24; page 28, lines 1-12). Stepnoski, Chairman of the Board, ultimately approached Weisman on behalf of the Board and offered him the position of Interim Township Manager, and Weisman assumed this position in November of 1999, while simultaneously maintaining his position as Finance Director. (Exhibit "P-112", page 29, lines 1-21; page 30, lines 14-20; page 33, lines 20-24; page 42, line 23 to page 43, line 11; Exhibit "P-187", ¶¶ 14, 15). Prior to accepting the position of Interim Township Manager, Weisman considered whether he could handle this position, and decided that he could, knowing it would require that he work over 60 hours per week. (Exhibit "P-112", page 35, lines 5-19; page 35, line 23 to page 36, line 1). During the time he served as both Interim Township

---

[3] Weisman has submitted with this Motion a packet of exhibits. The numbers correspond with Weisman's trial exhibits. Exhibit references are to that exhibit packet.

Manager and Finance Director, Weisman was able to handle the extensive hours he was working at that time. (Exhibit "P-112", page 37, line 17 to page 38, line 2; Exhibit "P-187", ¶ 16).

After success handling both the Interim Township Manager and Finance Director positions simultaneously, Weisman was approached by the Board in early 2000 about assuming the position of Township Manager on a full-time basis. (Exhibit "P-112", page 36, lines 2-23; Exhibit "P-187", ¶ 16). He negotiated agreements with the Board regarding his employment as Township Manager and submitted to the Board an employment agreement and a severance agreement. (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to page 67, line 23; page 86, lines 23-24; Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-187", ¶¶ 17, 18). The Board and Weisman agreed to these employment and severance contracts and their terms after negotiation. (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to page 67, line 23; Exhibit "P-2", page 58, line 25 to page 59, line 25; Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-187", ¶¶ 19, 20). These agreements were not signed by the Board, but they were approved by the Board, and the Board assured Weisman of its approval of the contracts.[4] (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to page 67, line 23; Exhibit "P-121", page 43, lines 18-24; Exhibit "P-187", ¶¶ 19, 20, 22, 24).

---

[4] The Amendment to Township Ordinance Number 57 *requires* the Township to have a written employment contract with the Township Manager. (Exhibit "P-2", page 53, lines 6-15; Exhibit "P-7"; Exhibit "P-25"). Specifically, this Amendment states, in relevant part, the following: "He [the Township Manager] shall receive no other compensation from the Township other than that set forth in that certain Contract for Employment between the Township and the Manager executed from time to time as deemed necessary by the Township." (Exhibit "P-7"; Exhibit "P-25"). The Township Manager prior to Weisman had a written employment contract with the Township. (Exhibit "P-2", page 129, line 25 to page 130, line 10). Weisman was paid and received benefits in accordance with the agreements after the Board publicly appointed him Township Manager. (Exhibit "P-112", page 58, line 11 to page 59, line 18; Exhibit "P-187", ¶ 23).

Weisman was appointed Township Manager by the Supervisors in July, 2000 and held this position until March 1, 2003. (Exhibit "P-112", page 86, lines 22-24; page 257, line 20 to page 259, line 13; page 266, lines 21-23; Exhibit "P-187", ¶ 23). After Weisman was officially appointed to the position of Township Manager in July of 2000, the conditions of his employment contract were put into place.[5] (Exhibit "P-112", page 58, line 11 to page 59, line 18; Exhibit "P-187", ¶ 23). Importantly, the Supervisors do not deny or dispute that the employment and severance agreements are accurate reflections of what was agreed to by Weisman and the Board! (Exhibit "P-116", page 52, line 16 to page 54, line 21; Exhibit "P-119", Part 1, page 72, line 20 to page 74, line 3; page 76, line 17 to page 78, line 2; Exhibit "P-115", page 89, line 16 to page 90, line 6). On the contrary, they claim that they do not remember. (Exhibit "P-116", page 52, line 16 to page 54, line 21; Exhibit "P-119", Part 1, page 72, line 20 to page 74, line 3; page 76, line 17 to page 78, line 2).

In March of 2001, Weisman took a leave of absence from the Township in order to have surgery to donate one of his kidneys to an ill relative and recover from this surgery. (Exhibit "P-112", page 70, lines 11-19; Exhibit "P-187", ¶ 26). Weisman used his accrued sick time to take this leave, and he was also advanced two weeks of sick leave by the Township, which the Township had done for at least one other employee previously pursuant to Township policy and practice. (Exhibit "P-112", page 71, lines 11-17; page 72, lines 12-15; page 75, lines 8-21; page 76, line 9 to page 78, line 19; page 80, line 19 to page 83, line 1; page 241, line 21 to page 243, line 1; page 245, lines 12-22;

---

[5] These conditions include (1) salary; (2) use of a Township vehicle; (3) pension plan provisions; (4) the Township's payment of relevant dues and subscriptions; (5) the Township's payment of continuing education classes; (6) implementation of a life insurance policy; and (7) vacation time. (Exhibit "P-6"; Exhibit "P-187", ¶ 23).

Exhibit "P-187", ¶¶ 26, 27).  Weisman's use of his accrued leaves and the advanced leave was never designated by the Township as FMLA leave.  (Exhibit "P-112", page 262, line 17 to page 263, line 8).

After the kidney surgery, Weisman was hospitalized in connection with mental illness, specifically a manic phase and suicidal thoughts, but to Weisman's knowledge, no one at the Township was even aware at that time that he suffered from mental illness. (Exhibit "P-112", page 87, line 15 to page 88, line 19).  Weisman returned to work approximately six weeks after the surgery.  (Exhibit "P-112", page 85, lines 16-23).  Both before and after his return from the surgery in March of 2001, Weisman did not have any problems performing his job as Township Manager effectively.  (Exhibit "P-112", page 86, line 14 to page 87, line 8).  The Township Supervisors thought Weisman was doing a good or excellent job.[6]  (Exhibit "P-119", Part 2, page 63, lines 18-21; page 65, lines 17-25; and page 66, lines 16-22; and page 67, line 8 to page 68, line 17; Exhibit "P-115", page 18, lines 13-15).

It was against this backdrop, in early December of 2002, that Weisman's mental health conditions caused him to be unable to work.  (Exhibit "P-112", page 140, lines 4-

---

[6] There was never any question as to Weisman's abilities, qualifications or work ethic.  (Exhibit "P-116", page 20, lines 20-25; page 40, line 5 to page 41, line 16; Exhibit "P-119", Part 2, page 62, line 5 to page 63, line 11; page 63, lines 18-21; page 65, lines 17-25; page 66, lines 16-22; page 67, line 8 to page 68, line 17; Exhibit "P-115", page 18, lines 13-15).  There is not one negative evaluation or comment in his personnel file.  (Exhibit "P-162"; Exhibit "187", § 55).  The Board recognized that Weisman was an exemplary employee of the Township.  (Exhibit "P-119", Part 2, page 63, lines 18-21; page 65, lines 17-25; page 66, lines 16-22).  In fact, Stepnoski has admitted that termination of Weisman's employment had nothing to do with his job performance.  (Exhibit "P-115", page 8, lines 13-16; page 18, lines 6-15; page 19, lines 6-25).  French testified that as far as she knew, until December 2, 2002, Weisman was doing an "excellent job" as Township Manager and that she knew of no facts that indicated that Weisman was not an excellent employee up through December 2, 2002.  (Exhibit "P-119", Part 2, page 63, lines 18-21; page 65, lines 17-25; page 66, lines 16-22).  Rowan indicated that the reasons Weisman was discharged did not have anything to do with his work performance.  (Exhibit "P-116", page 20, lines 20-25; page 40, line 5 to page 41, line 16).

19).   Weisman suffers from panic disorder, bipolar disorder and major depression.[7]
(Exhibit "P-112", page 20, lines 3-16; Exhibit "P-187", ¶ 2).   Weisman left work after a
half day on December 2, 2002 due to frequent panic attacks and extreme depression and
did not return.  (Exhibit "P-112", page 140, lines 4-16; Exhibit "P-187", ¶ 28).   Weisman
misrepresented to Dana Cozza (hereinafter "Cozza"), Director of Human Resources for
the Township, that he had pneumonia, although he did not.  (Exhibit "P-112", page 103,
lines 18 to page 104, line 15; Exhibit "P-187", ¶ 36).   Weisman misrepresented the true
nature of his disability because he was embarrassed about the fact that he had mental
illness.[8]  (Exhibit "P-8"; Exhibit "P-187", ¶ 36).

Cozza was responsible for handling administrative personnel functions, such as
illness issues.[9]   (Exhibit "P-112", page 105, lines 5-17).   Weisman initially informed
Mary Jane Atkinson (hereinafter "Atkinson"), a Township administrative assistant, that
he had pneumonia by telephone on December 4, 2002, and on December 9, 2002, he sent

---

[7] Weisman's diagnosis for major depression was made when he was a teenager and his bipolar disorder and panic disorder were diagnosed in about 1997.  (Exhibit "P-112", page 21, lines 1-18; Exhibit "P-187", ¶ 10).  Weisman has been taking medication to treat his depression since the early 1990's and has been prescribed medication for his mental illnesses continuously during that time.  (Exhibit "P-112", page 21, lines 19-24; page 22, lines 1-12).

[8] In her February 9, 2006 expert report, Plaintiff's expert, Gladys Fenichel, M.D., stated the following: "Mr. Weisman is an individual with a long history of a chronic psychiatric disorder.  It is not unusual for individuals with chronic psychiatric conditions to hide their diagnoses so as not to suffer the embarrassment and stigma associated with "mental illness."  When Mr. Weisman initially left work in early December, he misrepresented the nature of his illness.  It is my experience that it is not unusual for an individual with a psychiatric disorder to deny a history of psychiatric treatment or disability.  The records reflect that in December 2002 Mr. Weisman's cognitive functioning was affected by his emotional state.  It is my opinion that Mr. Weisman's psychiatric disorder also contributed to his lack [sic] judgment in regard to misrepresenting his condition."  (Exhibit "P-132", page 5).

[9] As French stated at her deposition, Cozza, as the Township Director of Human Resources, was the appropriate person with whom Weisman was to communicate regarding human resource issues and personnel matters, including administration of Family and Medical Leave Act (hereinafter "FMLA") leave and sick leave benefits, etc.  (Exhibit "P-119", Part 1, page 23, lines 7-14; page 33, line 5 to page 34, line 6; page 36, line 3 to page 38, line 19).

an email indicating this to Atkinson, with a copy sent to Cozza.[10]   (Exhibit "P-112", page 106, line 1 to page 109, line 19).

The reason Weisman did not go to work during this period of time was that he was experiencing panic attacks more frequently and intensely and had become extremely depressed.   (Exhibit "P-112", page 140, lines 4-16).   From December 6 through December 23, 2002, Weisman took part in an outpatient partial hospitalization program at the Horsham Clinic. (Exhibit "P-112", page 167, line 5 to page 168, line 12; Exhibit "P-187", ¶ 29). Moreover, during December of 2002, and for numerous months prior to that, Weisman was receiving treatment from a psychologist, Mary Lou Schack, Ph.D. (hereinafter "Schack") and a psychiatrist, Edward J. Goebel, M.D. (hereinafter "Goebel"). (Exhibit "P-112", page 150, lines 4-12; page 159, lines 5-8; page 196, lines 18-24).

Starting in December of 2002, substituting for Weisman, Stepnoski took over the managerial responsibilities at the Township.   (Exhibit "P-112", page 259, lines 14-17; page 263, line 19 to page 264, line 9; Exhibit "P-115", page 10, lines 12-15).   Stepnoski resigned as a member of the Board on February 16, 2003. (Exhibit "P-115", page 31, line 4 to page 32, line 8; page 90, line 8 to page 91, line 9).   He assumed the position of Interim Township Manager on paid status the next day.   (Exhibit "P-115", page 9, line 5 to page 11, line 5; page 91, lines 10-11; page 93, line 19 to page 95, line 19).

Defendant Stepnoski sent a letter to Weisman dated December 12, 2002 stating that Weisman was being put on formal notice that the Township was treating Weisman's

---

[10] The December 9, 2002 email was sent to Atkinson because she was the only person at the Township that had been communicating with Weisman since the previous week. (Exhibit "P-112", page 109, lines 5-12). During this leave from work, Weisman's emails to Township employees went unreturned. (Exhibit "P-112", page 174, lines 15-19).

absence as being covered by the FMLA, effective December 2, 2002, with twelve weeks of leave. (Exhibit "P-112", page 116, line 15 to page 118, line 13; Exhibit "P-1"; Exhibit "P-187", ¶ 37). The December 12, 2002 letter stated that the Township was charging Weisman's absence from work against his accrued but unused sick time. (Exhibit "P-112", page 118, lines 14-18; Exhibit "P-1"). Although not specifically set forth in the letter to Weisman, the FMLA leave as calculated by the Township was to expire at the end of February of 2003. (Exhibit "P-112", page 183, line 18 to page 184, line 13; page 185, lines 9-19). The letter requested Weisman to provide medical certification as allowed by the FMLA. (Exhibit "P-1").

By letter dated December 30, 2002 to Cozza, Weisman responded to the Township's December 12, 2002 letter, and stated in the response that the Township was not allowing Weisman to borrow two weeks of sick time during his absence, a benefit that other Township employees had previously been provided.[11]  (Exhibit "P-112", page 123, lines 3-7; page 124, lines 3-8 18-20; page 128, lines 4-10; Exhibit "P-8"; Exhibit "P-187", ¶¶ 39, 40, 41). This letter also stated that it was premature for Weisman to be placed on FMLA leave when he was, because FMLA should not have been triggered until after Weisman had exhausted all of the other paid leaves to which he was entitled. (Exhibit "P-112", page 133, lines 9-18; Exhibit "P-8"; Exhibit "P-120", page 70, line 20 to page 72, line 6).

In the letter, Weisman also admitted the true nature of his illness, apologized for his initial misrepresentation concerning his medical condition, expressed his

---

[11] By December of 2002, the Township had previously advanced two weeks of sick time to at least two Township employees, and had advanced up to two weeks of sick time to many other Township employees. (Exhibit "P-112", page 120, lines 5-19; page 245, lines 12-22; Exhibit "P-187", ¶¶ 26, 27).

embarrassment concerning his mental health diagnoses and indicated that pursuant to confidentiality requirements of the Equal Employment Opportunity Commission (hereinafter "EEOC"), Cozza should not reveal that Weisman had mental illness to the Township Supervisors or anyone else.[12] (Exhibit "P-112", page 135, line 21 to page 137, line 9; Exhibit "P-8"; Exhibit "P-187", ¶ 41).    Weisman specifically requested accommodations.  (Exhibit "P-8"; Exhibit "P-187", ¶ 41).  For example, he stated in this letter: "In light of the foregoing, I request that I be afforded all of these benefits promptly and retroactively.  This leave is necessary to accommodate my disability."  (Exhibit "P-8").  In the medical certifications attached to the letter, the accommodation of leaves of absence was made known to the Defendants.  (Exhibit "P-8").  Moreover, the fact that Weisman was suffering specifically from mental illnesses was not relevant to the Board's decision about how to respond to Weisman's requests for accommodations of his disability made in that letter, since the accommodations requested were in compliance with Township practice and policy.  (Exhibit "P-112", page 137, lines 10-24; Exhibit "P-8").

Other than receiving compensation for his earned and accrued leave, Weisman, primary breadwinner for his wife and two minor daughters, received no compensation or benefits from the Township starting in the beginning of December of 2002.  (Exhibit "P-112", page 185, lines 1-4; page 205, line 21 to page 206, line 3; Exhibit "P-115", page 74, lines 8-19).  This was in spite of the Township's short-term disability policy, as well as Weisman's employment and severance agreement terms, which indicate that Weisman should have been compensated.  (Exhibit "P-115", page 37, lines 22-25; page 72, line 5

---

[12] Cozza nonetheless did tell the Board that Weisman suffered from a mental illness.  (Exhibit "P-112", page 237, line 18 to page 239, line 1; Exhibit "P-119", Part 1, page 21, line 20 to page 24, line 14; page 32, lines 12-25; Exhibit "P-115", page 62, line 21 to page 63, line 21; Exhibit "P-187", ¶ 46).

to page 73, line 17; Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-187", ¶ 42, 68, 69). Weisman became increasingly depressed as a result of his deteriorating financial situation. (Exhibit "P-112", page 184, lines 20-24).

Weisman felt throughout the period of his recovery starting in December of 2002 that he would be capable of returning to work as Township Manager, but would be doing so on a part-time basis at first. (Exhibit "P-112", page 212, line 24 to page 213, line 22; page 215, lines 5-11; page 216, lines 14-20; Exhibit "P-187", ¶ 57).  However, the Township and the Board did not offer to engage in the interactive process with Weisman. (Exhibit "P-112", page 218, line 22 to page 219, line 10; Exhibit "P-187", ¶ 42).  In fact, unknown to Weisman, he was not reappointed Township Manager at the January 6, 2003 Township Reorganization Meeting![13] (Exhibit "P-186").

Moreover, the Defendants did not offer Weisman any leave of absence beyond February 28, 2003 to accommodate his disability. (Exhibit "P-112", page 219, lines 18-22; Exhibit "P-187", ¶ 42).  The Defendants did not offer Weisman such reasonable accommodations as the following: (1) a leave of absence beyond February, 2003, (Exhibit "P-112", page 219, lines 18-22); (2) a return to work, first on a part-time basis, and ultimately, on a full-time basis, as Township Manager, (Exhibit "P-112", page 220, line 2 to page 223, line 4; Exhibit "P-187", ¶ 48); (3) leave pursuant to the Township's short-term disability policy, (Exhibit "P-112", page 245, lines 12-14; page 250, line 24 to

---

[13] Weisman and his counsel learned of the Township's failure at the January 6, 2003 Township Reorganization Meeting to reappoint Weisman as Township Manager *for the first time* as a result of testimony provided by Township Solicitor Craig Smith at his February 13, 2006 deposition.  (Exhibit "P-121", page 23, line 1 to page 24, line 17; Exhibit "P-187, ¶ 45).  Moreover, a former Township executive assistant, Anne Marie Lusen, whose roles in January of 2003 included preparing the agenda booklets for the Township Supervisors, preparing the resolutions making the Township appointments and attending all the Reorganization Meetings, indicated the following at her July 17, 2006 deposition: (1) *Weisman was not reappointed Township Manager at the January, 2003 Reorganization Meeting because he was no longer Township Manager at that point*; and (2) Stepnoski was appointed Interim Township Manager before the January, 2003 Reorganization Meeting.  (Exhibit "P-195", page 8, line 3 to page 32 line 24).

page 251, line 10; Exhibit "P-116", page 91, lines 17-25; Exhibit "P-6"); (4) use of paid and accrued time prior to placement on FMLA leave, (Exhibit "P-112", page 133, lines 9-18); (5) advancement of sick time, (Exhibit "P-112", page 183, line 18 to page 184, line 13; page 185, lines 9-19); and (6) more assistance, (Exhibit "P-112", page 222, line 22 to page 223, line 4; Exhibit "P-187", ¶ 56).

The notes of Weisman's psychologist, Mary Lou Schack, Ph.D. (hereinafter "Schack") indicate that during January of 2003 through April of 2003, Weisman continued to make progress, his depression was often lifted, and he had only a few episodes of hypomania and a few panic attacks. (Exhibit "P-112", page 193, line 6 to page 194, line 1; Exhibit "P-105"). Weisman agrees that this generally reflects his condition during that time. (Exhibit "P-112", page 193, line 6 to page 194, line 1). Schack's notes from March 13 through 17, 2003 indicate that Weisman seemed to be getting more stable. (Exhibit "P-112", page 187, line 14 to page 188, line 3). Schack believed that Weisman was ready to return to work by the end of March of 2003.[14] (Exhibit "P-105"; Exhibit "P-117" page 137, lines 13-24, page 138, lines 1-11).

Without engaging in any interactive process, the Defendants fired Weisman because he was disabled effective March 1, 2003.[15] (Exhibit "P-112", page 218, line 22

---

[14] Weisman would have been able to return to his job on a "full-time" basis, meaning 60 to 80 hours per week, by the end of March of 2003. (Exhibit "P-112", page 271, lines 19-24; Exhibit "P-187", ¶ 63). Had Weisman been aware of his right to a reduced schedule or intermittent leave, he would have been able to structure his leave in such a way so as to allow him to return to work within the twelve weeks provided by FMLA. (Exhibit "P-112", page 267, line 9 to page 268, line 11). However, Weisman was not aware that he had such options. (Exhibit "P-112", page 267, line 24 to page 268, line 11; Exhibit "P-187", ¶ 57).

[15] In the first week of March, 2003, Weisman received a letter via first class mail dated February 28, 2003 authored by Rowan. (Exhibit "P-28"; Exhibit "P-187", ¶ 52). The letter indicated that, as of the next day, March 1, 2003, Weisman's employment "must be deem[ed] terminated" due to Weisman's failure to return to work after the alleged expiration of his FMLA leave. (Exhibit "P-28"; Exhibit "P-187", ¶ 52). (There is a dispute as to when and whether Weisman's FMLA leave actually ended which cannot be disposed of by Summary Judgment.) No vote terminating Weisman, the highest ranking employee of the Township, was ever made at a public meeting. (Exhibit "P-116", page 21, lines 10-18; page 145, lines 7-15; Exhibit "P-

to page 219, line 10; page 257, line 20 to page 259, line 13; page 266, lines 21-23; Exhibit "P-187", ¶¶ 42, 52).  This action was not taken at a public Board meeting as required by the Second Class Township Code.  (Exhibit "P-116", page 21, lines 10-18; page 145, lines 7-15; Exhibit "P-119", Part 2, page 19, line 23 to page 20, line 16; Exhibit "P-115", page 59, line 23 to page 60, line 15; Exhibit "P-187", ¶ 3).  No Township employees or members of the Board ever informed Weisman during his FMLA leave that his employment would be terminated if he did not return to work at the expiration of that leave.  (Exhibit "P-112", page 257, line 20 to page 259, line 13; page 266, lines 21-23; Exhibit "P-187", ¶ 47).

After Weisman was fired, the Township contested unemployment benefits for Weisman beginning in April, 2003.  (Exhibit "P-7"; Exhibit "P-84"; Exhibit "P-87"; Exhibit "P-89"; Exhibit "P-90"; Exhibit "P-120", page 124, lines 4-10).  This was in violation of Weisman's severance agreement, which states:

> "The Township agrees not to participate or otherwise oppose any proceedings to secure unemployment compensation for Weisman, and further agrees if contacted for information regarding the circumstances of Weisman's termination, to provide only financial information to the Department of Labor and Industry, Bureau of Unemployment Compensation."

(Exhibit "P-7", ¶ 5(d)).

Moreover, the documents submitted by the Township to the Unemployment Compensation Center indicate an unfounded belief that Weisman was not capable of

---

119", Part 2, page 19, line 23 to page 20, line 16; Exhibit "P-115", page 59, line 23 to page 60, line 15). *The Defendants admit that they never voted to terminate Weisman's employment at a public meeting.* (Exhibit "P-150" and Exhibit "P-151", Request for Admission and Response Number 35).  The Board has done nothing to date at any public meeting since 2003 to ratify its unlawful vote to fire Weisman.  (Exhibit "P-116", page 21, lines 10-18; page 145, lines 7-15; Exhibit "P-119", Part 2, page 19, line 23 to page 20, line 16; Exhibit "P-115", page 59, line 23 to page 60, line 15).

working because of his disability.  (Exhibit "P-84"; Exhibit "P-86"; Exhibit "P-87"; Exhibit "P-88"; Exhibit "P-120", page 124, lines 4-10).

Against this backdrop, Weisman respectfully requests this Honorable Court to grant Partial Summary Judgment in his favor and against the Defendants regarding Defendants' discriminatory practices under the ADA and PHRA, the Township's breach of Weisman's employment and severance agreements with the Township[16], the Township's failure to keep its promises to Weisman and Defendants' violation of the Second Class Township Code.

## STANDARD OF REVIEW

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *Lang v. New York Life Insurance Company*, 721 F.2d 118 (3d Cir. 1983); Fed.R.Civ.P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Demeter v. Buskirk*, 2003 WL 22416082 (E.D. Pa. Oct. 20, 2003).  A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*  "The inquiry is whether the evidence – viewed in the light most favorable to the nonmoving party – presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

---

[16] At approximately the time of the filing of this Motion for Partial Summary Judgment, the Plaintiff is filing a Motion for Sanctions for Defendants' Spoliation of Evidence related to the Plaintiff's breach of contract claim.

The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988). This burden may be discharged by demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. Moreover, when the non-moving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Service Corp.*, 812 F.2d 141, 144 (3d Cir.1987), *quoting Celotex*, 477 U.S. at 322.

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White*, 862 F.2d at 59 (*quoting Celotex*, 477 U.S. at 322). The non-movant must specifically identify evidence of record, *as opposed to general averments*, which supports his claim and upon which a reasonable jury could base a verdict in his favor. *Celotex*, 477 U.S. at 322. The non-movant cannot avoid summary judgment by substituting "conclusory allegations of the complaint . . . with conclusory allegations of an affidavit." *Lujan v. National Wildlife Found.*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L.Ed.2d 695 (1990). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. *Page v. School District of Philadelphia*, 45 F. Supp. 2d 457 (E.D. Pa. 1999), *citing Anderson, supra,* 477 U.S. at 248-49.

<u>ARGUMENT</u>

I.   **JUDGMENT SHOULD BE ENTERED ON BEHALF OF WEISMAN ON COUNTS III AND V OF PLAINTIFF'S AMENDED COMPLAINT BECAUSE THE DEFENDANTS DISCRIMINATED AGAINST WEISMAN BY THEIR FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS WITH WEISMAN TO TRY TO ACCOMMODATE HIS DISABILITY, THEIR FAILURE TO PROVIDE ACCOMMODATIONS, AND THEIR TERMINATION OF HIS EMPLOYMENT, IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND THE PENNSYLVANIA HUMAN RELATIONS ACT.**

Weisman suffers from panic disorder, bipolar disorder and major depression. (Exhibit "P-112", page 20, lines 3-16; Exhibit "P-187", ¶ 2). Weisman's diagnosis for major depression was made when he was a teenager, and his bipolar disorder and panic disorder were diagnosed in about 1997. (Exhibit "P-112", page 21, lines 1-18; Exhibit "P-187", ¶ 10). Weisman has been taking medication to treat his depression since the early 1990's and has been prescribed medication for his mental illnesses continuously during that time. (Exhibit "P-112", page 21, lines 19-24; page 22, lines 1-12). He has had exacerbations of his illnesses, including subsequent to kidney surgery he underwent in March of 2001. (Exhibit "P-112", page 87, line 15 to page 88, line 19; Exhibit "P-187", ¶¶ 11, 26). According to Dr. Fenichel, "in December 2002 Mr. Weisman had a long standing disability that caused substantial limitations in life activities that included sleep, concentration, and the ability to engage in productive employment. The disability was a consequence of the conditions of bipolar disorder and generalized anxiety disorder/panic disorder." (Exhibit "P-132", page 6).

Weisman left work after a half day on December 2, 2002 due to frequent panic attacks and extreme depression. (Exhibit "P-112", page 140, lines 4-16; Exhibit "P-187", ¶ 28). He did not subsequently return. His mental health conditions caused him to be

unable to think and work. (Exhibit "P-112", page 140, lines 4-19). In response to Weisman's illness, Defendant Stepnoski sent a letter to Weisman dated December 12, 2002 stating that Weisman was being put on formal notice that the Township was treating Weisman's absence as being covered by the FMLA, effective December 2, 2002, with twelve weeks of leave, and that the Township was charging Weisman's absence from work against his accrued but unused sick time. (Exhibit "P-112", page 116, line 15 to page 118, line 13; page 118, lines 14-18; Exhibit "P-1" ; Exhibit "P-187", ¶ 37).

By letter dated December 30, 2002 to Human Resources Director Cozza, Weisman responded to the Township's December 12, 2002 letter. (Exhibit "P-8"; Exhibit "P-187", ¶ 41). In his response, he (i) questioned why the Township was not allowing him to borrow two weeks of sick time during his absence, a benefit that other Township employees had previously been provided[17]; (ii) asserted that it was premature for Weisman to be placed on FMLA leave when he was, because FMLA should not have been triggered until after Weisman had exhausted all of the other paid leaves to which he was entitled, (Exhibit "P-112", page 123, lines 3-7; page 124, lines 3-8 18-20; page 128, lines 4-10; page 133, lines 9-18; Exhibit "P-8"; Exhibit "P-120", page 70, line 20 to page 72, line 6); (iii) requested accommodations in the nature of a leave, stating, in part: "I request that I be afforded all of these benefits promptly and retroactively. This leave is necessary to accommodate my disability", (Exhibit "P-115", page 64, lines 6-13; Exhibit "P-8"); and (iv) provided FMLA medical certifications which also notified the Defendants of Weisman's need for accommodations in the nature of a leave of absence

---

[17] By December of 2002, the Township had previously advanced two weeks of sick time to at least two Township employees, and had advanced up to two weeks of sick time to many other Township employees. (Exhibit "P-112", page 120, lines 5-19; page 245, lines 12-22; Exhibit "P-187", ¶¶ 26, 27).

and a period of transition back to work on a part-time basis. (Exhibit "P-8"; Exhibit "P-187", ¶ 41).

Despite medical information and requests for accommodations, the Defendants failed to engage in the interactive process with Weisman and did not provide any accommodations for his disability. (Exhibit "P-116", page 64, line 22 to page 65, line 1; Exhibit "P-119", Part 1, page 82, line 24 to page 83, line 3; Exhibit "P-187", ¶ 42). The Defendants did not offer Weisman any leave of absence beyond February, 2003 to accommodate his disability. (Exhibit "P-112", page 219, lines 18-22; Exhibit "P-187", ¶ 42). The Defendants did not offer Weisman such reasonable accommodations as the following: (1) a leave of absence beyond February 2003, based on his disability, (Exhibit "P-112", page 219, lines 18-22); (2) a return to work, first on a part-time basis, and ultimately, on a full-time basis, as Township Manager, (Exhibit "P-112", page 220, lines 2 to page 223, line 4; Exhibit "P-187", ¶ 48); (3) leave pursuant to the Township's short-term disability policy, (Exhibit "P-112", page 245, lines 12-14; page 250, line 24 to page 251, line 10; Exhibit "P-116", page 91, lines 17-25; Exhibit "P-6"); (4) use of paid and accrued time prior to placement on FMLA leave, (Exhibit "P-112", page 133, lines 9-18); (5) advancement of sick time, (Exhibit "P-112", page 183, line 18 to page 184, line 13; page 185, lines 9-19); and (6) more assistance. (Exhibit "P-112", page 222, line 22 to page 223, line 4; Exhibit "P-187", ¶ 56). Instead, the Township fired Weisman effective March 1, 2003 because he was disabled and regarded by the Defendants as being disabled. (Exhibit "P-112", page 218, line 22 to page 219, line 10; page 257, line 20 to page 259, line 13; page 266, lines 21-23; Exhibit "P-116", page 22, line 24 to page 23,

line 2; page 87, line 20 to page 88, line 2; page 89, lines 2-6, 12-13; page 90, line 16-25;

Exhibit "P-119", Part 1, page 26, line 23 to page 28, line 7).

Under these undisputed facts, Weisman submits that as analysis of an ADA claim

applies equally to the analysis of a PHRA claim, Weisman's argument herein will focus

solely on the law as set forth regarding ADA claims. *See Kelly v. Drexel University,* 94

F.3d 102, 105 (3d Cir. 1996). Because there is no dispute of material fact that the

Defendants did not engage in the interactive process to try to accommodate Weisman's

disability so he could return to work, instead unlawfully terminating him, judgment

should be entered on behalf of Weisman on Counts III and V of Plaintiff's Amended

Complaint.

In order for a plaintiff to establish a prima facie claim of discrimination under the

ADA, the plaintiff must demonstrate the following: "(1) he is a disabled person within

the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions

of the job, with or without reasonable accommodations by the employer; and (3) he has

suffered an otherwise adverse employment decision because of the discrimination." *Gaul

v. Lucent Technologies,* 134 F.3d 576, 580 (3d Cir. 1998); *Dogmanits v. Capital Blue

Cross,* 2005 WL 1610660 (E.D.Pa. 2005).

The Third Circuit Court of Appeals has defined discrimination based on an ADA

disability as follows:

> "Discrimination under the ADA . . . includes failing to make reasonable
> accommodations for a plaintiff's disabilities. The ADA specifies that an
> employer discriminates against a qualified individual with a disability
> when the employer does not make reasonable accommodations to the
> known physical or mental limitations of the individual unless the
> employer can demonstrate that the accommodation would impose an
> undue hardship on the operation of the business of the employer."

20

*Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3d Cir. 1999).

Discrimination can take more than one form. In addition to terminating Weisman's employment because of his disability, the Defendants never even attempted to determine what accommodations could be made to return Weisman to work. (Exhibit "P-115", page 17, lines 4-6). As discussed further below, in this case, there is no dispute that the Defendants failed to even discuss accommodations with Weisman, and there is no evidence that any reasonable accommodation, like a leave of absence, would have caused the Defendants an undue hardship. Indeed, the Defendants admitted that accommodations could have been provided!

### A.   Weisman was disabled under the terms of the ADA.

Under the ADA, Weisman can establish that he has a disability[18] if he has a mental impairment that substantially limits[19] a major life activity, has a record of such impairment or is regarded as having such impairment.[20]  42 U.S.C. § 12102(2); *see also, Dogmanits, supra.*   The *E.E.O.C. Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*, Addendum, page 4, states that a "mental

---

[18] ". . . [T]he determination of whether an individual is "disabled" is not based solely on a name or the stereotypical nature and character of an impairment, but rather on the 'effect of that impairment on the life of the individual.'" *Dogmanits, supra* at *4. "Congress intended that each determination be made on a case-by-case basis." *Dogmanits, supra* at *4, *citing Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

[19] "EEOC regulations created for interpreting the ADA define 'substantially limit' as '[u]nable to perform a major life activity that the average person in the general population can perform'; or '[s]ignificantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Dogmanits, supra* at *4 (*quoting* 29 C.F.R. § 1630.2(j)). "The nature and severity of the impairment, the duration or expected duration of the impairment, and the actual or expected permanent or long-term impact of the impairment should also be considered." *Dogmanits, supra* at *4 (*quoting* 29 C.F.R. § 1630.2(j)(2)(i)-(iii)).

[20] The Supreme Court has determined that an ADA "disability" must include an impairment with an impact that is "permanent or long-term." *Dogmanits, supra* at *4, *quoting Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 195, 198 (2002).

impairment" includes major depression, bipolar disorder and anxiety/panic disorders. The Third Circuit has accepted "thinking" as a major life activity. *Taylor v. Phoenixville School District,* 184 F.3d 296, 307 (3d Cir. 1999). Moreover, the United States Supreme Court considers "working"[21] to be a major life activity.[22] *Toyota Motor Mfg., Inc. v. Williams,* 534 U.S. 184, 195, 198 (2002); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

> Moreover, a person is "regarded as" having a disability if the person:
>
> "(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment."

*Williams v. Philadelphia Housing Authority Police Department,* 380 F.3d 751, 766 (3d Cir. 2004); *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 188 (3d Cir. 1999) (*quoting* 29 C.F.R. § 1630.2(1)).

It is clear that Weisman had a disability as defined by the ADA in December of 2002. Weisman's diagnoses of bi-polar disorder, major depression and panic disorder, mental impairments under the ADA, substantially limited his major life activities of

---

[21] "The ability to work is clearly a major life activity . . .. With regard to 'working,' the inability to perform a single, particular job does not constitute a substantial limitation. 29 C.F.R. § 1630.2(j)(3)(i) . . . Rather, the term 'substantially limits' means that the plaintiff is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. 29 C.F.R. § 1630.2(j)(3)(i)." *Shannon v. City of Phila.,* 1999 WL 1065210, at *3 (E.D.Pa. 1999).

[22] "'Major life activities' are defined to include 'those basic activities that the average person in the general population can perform with little or no difficulty.' 29 C.F.R. § 1630.2(i) app. They include 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' 29 C.F.R. § 1630.2(i)." *Shannon, supra* at *3.

working and thinking beginning on December 2, 2002. (Exhibit "P-112", page 140, lines 4-19; Exhibit "P-187", ¶¶ 69, 71). Weisman's diagnosis for major depression was made when he was a teenager, and his bipolar disorder and panic disorder were diagnosed in about 1997. (Exhibit "P-112", page 21, lines 1-18; Exhibit "P-187", ¶ 10). Weisman has been taking medication to treat his depression since the early 1990's and has been prescribed medication for his mental illnesses continuously during that time. (Exhibit "P-112", page 21, lines 19-24; page 22, lines 1-12). While working at the office on December 2, 2002, Weisman was experiencing frequent panic attacks and became extremely depressed. (Exhibit "P-112", page 140, lines 4-19; Exhibit "P-187", ¶ 28). In an effort to care for himself and alleviate these conditions, Weisman left work around mid-day on December 2, 2002. (Exhibit "P-112", page 140, lines 4-16; Exhibit "P-187", ¶ 28). He had had prior exacerbations, including subsequent to his kidney surgery, when he was hospitalized in connection with mental illness, specifically a manic phase and suicidal thoughts. (Exhibit "P-112", page 87, line 15 to page 88, line 19). Weisman continues to receive treatment for his mental illnesses. (Exhibit "P-112", page 297, lines 6-13). However, having received proper treatment and medications, Weisman returned to full-time employment in the fall of 2005 with another employer without any accommodations. (Exhibit "P-112", page 275, lines 4-7; page 283, lines 5-7; page 296, line 24 to page 297, line 23).

Plaintiff's expert, Gladys Fenichel, M.D., stated the following in her February 9, 2006 expert report: "It is my opinion that in December 2002 Mr. Weisman had a long standing disability that caused substantial limitations in life activities that included sleep, concentration, and the ability to engage in productive employment. The disability was a

23

consequence of the conditions of bipolar disorder and generalized anxiety disorder/panic disorder." (Exhibit "P-132", page 5). Even Defendants' expert, in his February 20, 2006 report, does not dispute that Weisman was disabled. (Exhibit "P-183", pages 16 and 17).

The Defendants themselves have not disputed this information. In fact, it is clear from the depositions that the Township, through the Supervisors, considered Weisman to be disabled. (Exhibit "P-116", page 22, line 24 to page 23, line 2; page 87, line 20 to page 88, line 2; page 89, lines 2-6, 12-13; page 90, line 16-25; Exhibit "P-119", Part 1, page 26, line 23 to page 28, line 7; Exhibit "P-120", page 123, line 25 to page 124, line 10). The undisputed evidence that the Defendants regarded him as disabled is exemplified by their words and documents. When Rowan was asked at his deposition when he first learned that Weisman had a disabling condition, he responded by saying "[u]pon receipt of that [December 30, 2002] letter." (Exhibit "P-116", page 22, line 24 to page 23, line 1). When Stepnoski was asked at his deposition whether it was his understanding that Weisman was disabled, he stated that "[i]t is now, yes." (Exhibit "P-115", page 8, lines 17-18).

Cozza testified as follows at her deposition:

"Q:   ... Now, is your understanding that Mr. Weisman was disabled as a result of a mental illness; right?

A:   Yes."

(Exhibit "P-120", page 123, line 25 to page 124, line 3).

Weisman was certainly disabled, as the facts of this case bear out, and he was certainly "regarded as" disabled by the Defendants[23], which requires that a lower

---

[23] "Regarded as" employees are entitled to reasonable accommodations under the ADA in the same way as those who are actually disabled. *Williams, supra.*

24

threshold be met.  Regardless of whether he was actually disabled or simply regarded as disabled, Weisman was entitled to reasonable accommodations by the Township.

**B.     Weisman was a "qualified individual" as defined by the ADA.**

The next step in the analysis requires Weisman to establish that he was a "qualified individual" under the guidelines of the ADA.  A person is a "qualified individual" under the ADA if the person (1) satisfies the prerequisites of the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc., and (2) can perform the essential functions of the position[24] held or desired, with or without reasonable accommodations. *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 278 (3d Cir. 1998); *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir. 1998); *Dogmanits, supra*; 42 U.S.C. § 12111.

Certainly, what qualifies as a "reasonable accommodation" requires a fact-intensive analysis, although the law does specify certain accommodations that may be reasonable.  It is well-established that a reasonable accommodation can include a leave of absence or part-time or modified work schedules.  *Dogmanits, supra*; 42 U.S.C. § 12111(9)(B).  A number of courts have recognized that a leave of absence for medical treatment or restoration of health may constitute a reasonable accommodation under the

---

[24] "Under the ADA, 'essential functions' are defined to include the 'fundamental job duties' of a particular position. 29 C.F.R. § 1630.2(n)(1).  Evidence of whether a certain function is "essential" includes, among other things: the employer's judgment as to what functions of a job are essential; the amount of time spent on the job performing the particular function; the consequences of not requiring the job holder to perform the function; and the number of other employees available among whom the performance of a particular function may be distributed.  42 U.S .C. § 12111(8)(listing factors); 29 C.F.R. § 1630.2(n)(3) (same) . . . Whether or not a particular function is essential is a factual determination made on a 'case by case' basis. 29 C.F.R. 1630.2(n) app.  For most jobs, regular attendance at work is an essential function . . . However, where a leave from work is at issue, whether attendance is an essential function of a particular job is 'not the relevant inquiry.'" *Shannon, supra* at *5.

ADA.[25]   *See Dogmantis, supra; Shannon v. City of Phila.*[26], 1999 WL 1065210, at *5

(E.D.Pa. 1999)[27].   The EEOC interpretive guidelines to the ADA state that a reasonable

accommodation could include "additional unpaid leave for necessary medical treatment."

29 C.F.R. § 1630.2(*o*).

An employer commits unlawful discrimination under the ADA and PHRA if the

employer does not make reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability who is an employee,

unless the employer can demonstrate that the accommodation would impose an undue

hardship[28] on the operation of the business of the employer.[29]    42 U.S.C. §

---

[25] Whether a request for leave is reasonable turns on the facts of the case. *Shannon v. City of Phila.*, 1999 WL 1065210, at *5 (E.D.Pa. 1999); Courts have held that a leave of five months for medical treatment was a reasonable accommodation. *Id.* Further, reasonable accommodation is a "continuing" duty and is not exhausted by one effort. *Id., citing Ralph v. Lucent Tech., Inc.*, 135 F .3d 166, 172 (1st Cir.1998)(finding that an employer may be required to grant additional accommodations beyond a 52-week leave with pay for an employee who suffered mental breakdown).

[26] In that case, the plaintiff requested an additional three months of unpaid leave for medical treatment following twelve weeks of FMLA leave. *Shannon, supra* at *6. The plaintiff's physician was "hopeful" that the plaintiff's symptoms would "resolve nearly entirely" within a year, and he opined that the plaintiff would be "fully fit" to return to work in three to six months. *Id.* The court determined that a reasonable jury could conclude that the plaintiff's request for an additional three months of unpaid leave for medical treatment was a reasonable accommodation. *Id.*

[27] *See also Basith v. Cook County,* 241 F.3d 919, 932 (7th Cir. 2001); *Humphrey v. Memorial Hospitals Assoc.,* 239 F.3d 1128 (9th Cir. 2001); *Criado v. IBM Corp.,* 145 F.3d 437 (1st Cir. 1998)(stating that a leave may constitute reasonable accommodation); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 782 (6th Cir.1998) (*citing Criado, supra*); *Rascon v. U.S. West Communications, Inc.,* 143 F.3d 1324, 1334 (10th Cir. 1998) (stating that "time for medical care or treatment may constitute a reasonable accommodation"); *Dockery v. North Shore Med. Ctr.,* 909 F.Supp. 1550, 1560 (S.D.Fla. 1995) (recognizing that unpaid leave may constitute a reasonable accommodation); *Schmidt v. Safeway, Inc.,* 864 F.Supp. 991, 996 (D.Or. 1994) (stating that a reasonable accommodation may include a leave of absence for treatment); *Vializ v. New York City Bd. of Education*, 1995 WL 110112, at *3 (S.D.N.Y. 1995)(stating that "[w]here, as here, plaintiff alleges that she was at one time an exemplary employee who would have been able to return to work if defendant had provided the accommodation of a temporary leave of absence, it is inappropriate to dismiss the claim").

[28] "'Undue hardship' means an action that requires 'significant difficulty or expense' when considered in light of the following factors: (i) the nature and cost of the accommodation needed ⋯; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its

12112(b)(5)(A); *see Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d. 538 (7th Cir. 1995)(indicating that undue hardship is an affirmative defense that an employer must prove).

There is no dispute of fact that Weisman was a qualified individual as defined by the ADA. Quite simply, Weisman both: (1) satisfied the prerequisites for the position of Township Manager; and (2) was able to perform the essential functions of this position with reasonable accommodations, and was able to return to work by the end of March of 2003. Indeed, he may have been able to return sooner on a part-time basis, but the Defendants' utter failure to engage in the interactive process or to advise him of his right to intermittent or reduced schedule leave under the FMLA deprived him of the opportunity of trying. Weisman's expert, Gladys Fenichel, M.D., wrote in her expert report that Weisman was ready for "a gradual return to part time employment [as Township Manager] with a plan to increase his hours" beginning in February of 2003. (Exhibit "P-132", page 7).

Weisman clearly satisfied the prerequisites for the position of Township Manager. Weisman held the high-ranking positions of Finance Director, Interim Township Manager and Township Manager from 1998 until he was fired in March, 2003. For several months, Weisman held these positions simultaneously. (Exhibit "P-112", page

---

employees; the number, type, and location of its facilities; and (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the work force of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity. 42 U.S.C. § 12111(10)." *Shannon, supra* at *6.

[29] "As to the issue of whether a particular accommodation is reasonable or an undue hardship, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits. *Walton v. Mental Health Ass'n*, 168 F.3d 661, 670 (3d Cir.1999). Following such a showing by the plaintiff, the burden shifts to the defendant to prove that the accommodation is unreasonable or that it creates an undue hardship. *Id.*" *Shannon, supra* at *6.

27, lines 13-24; page 28, lines 1-12; page 29, lines 1-21; page 30, lines 14-20; page 33, lines 20-24; page 42, line 23 to page 43, line 11; Exhibit "P-187", ¶ 15). There was never any question as to Weisman's abilities, qualifications or work ethic. (Exhibit "P-116", page 20, lines 20-25; page 40, line 5 to page 41, line 16; Exhibit "P-119", Part 2, page 62, line 5 to page 63, line 11; page 63, lines 18-21; page 65, lines 17-25; page 66, lines 16-22; page 67, line 8 to page 68, line 17; Exhibit "P-115", page 18, lines 13-15). There is not one negative evaluation or comment in his personnel file. (Exhibit "P-162"; Exhibit "P-187", ¶ 55). The Board recognized that Weisman was an exemplary employee of the Township. (Exhibit "P-119", Part 2, page 63, lines 18-21; page 65, lines 17-25; page 66, lines 16-22). In fact, Stepnoski has admitted that termination of Weisman's employment had nothing to do with his job performance. (Exhibit "P-115", page 8, lines 13-16; page 18, lines 6-15; page 19, lines 6-25). Along those lines, Stepnoski testified as follows at his deposition:

> "Q:   Did his dismissal involve job performance issues in any way, shape or form?
>
> A:   No."

(Exhibit "P-115", page 18, lines 13-15).

Weisman was able to fulfill the essential functions of his positions with the Township from the time he began working in 1998 until December, 2002. (Exhibit "P-119", Part 2, page 63, lines 18-21; page 65, lines 17-25; page 66, lines 16-22; Exhibit "P-187", ¶ 54). During this time, Weisman performed the necessary functions of his positions without the Township or the Board even knowing of his disability. (Exhibit "P-112", page 135, line 21 to page 137, line 9; Exhibit "P-116", page 22, line 24 to page 23, line 1; Exhibit "P-8").

It is undisputed that a disability leave beyond February of 2003 and a gradual return to work would have been a reasonable accommodation of Weisman's disability. There is no issue of material fact that there would have been no undue hardship on the Township by accommodating Weisman with an extended leave. Thus, Weisman could certainly have been reasonably accommodated. The following are reasonable accommodations that would have accommodated Weisman's disability: (1) a leave of absence based on his disability[30]; (2) exhaustion of all accrued, unused paid leaves prior to placement on FMLA leave[31]; (3) a return to work, first on a part-time basis[32], and ultimately, on a full-time basis[33], as Township Manager, (Exhibit "P-112", page 220, line 2 to page 223, line 4; Exhibit "P-187", ¶ 59)[34]; (4) advancement of sick time, (Exhibit "P-

---

[30] This could have included disability leave, pursuant to the Township's previously adopted short-term disability policy, advanced sick leave, pursuant to the Township's previously-implemented advanced sick leave policy or simply an unpaid leave. (Exhibit "P-112", page 120, lines 5-19; page 218, line 22 to page 219, line 3; page 219, lines 18-22; page 243, lines 2-15; page 245, lines 12-22; page 250, line 24 to page 252, line 4; Exhibit "P-6"; Exhibit "P-119", Part 1, page 56, line 10 to page 58, line 5; Exhibit "P-115", page 37, lines 22-25; page 72, line 5 to page 73, line 17; Exhibit "P-187", ¶¶ 58, 59, 61).

[31] The Township's practice and custom prior to December 2, 2002 was to not designate leave for illness as FMLA time if employees had paid or vacation time available. (Exhibit "P-112", page 261, line 11 to page 262, line 16).

[32] If Weisman had returned as Township Manager, temporarily on a part-time basis, contributions from other Township employees would have been necessary during that period of time to perform the duties of the position to Weisman's standards. (Exhibit "P-112", page 222, line 22 to page 223, line 4; Exhibit "P-187", ¶ 61). Moreover, "part-time" is relative, and in his situation does not mean less than 40 hours per week, since Weisman had been working 60 to 80 hours per week as Township Manager. (Exhibit "P-112", page 269, line 15 to page 270, line 9; page 271, lines 14-18; Exhibit "P-187", ¶ 54). Additionally, Schack indicated in March of 2003 and subsequently that Weisman could work in March of 2003 if he started out part-time and gradually worked up to full time. (Exhibit "P-112", page 270, line 13 to page 271, line 18; page 273, lines 5-7). Moreover, as French testified, there was no reason why Stepnoski could not continue to substitute for Weisman until Weisman was ready to return. (Exhibit "P-119", Part 1, page 89, line 15 to page 90, line 25; Exhibit "P-187", ¶ 61).

[33] Weisman would have been able to return to his job on a "full-time" basis, meaning 60 to 80 hours per week, by the end of March of 2003. (Exhibit "P-112", page 271, lines 19-24; Exhibit "P-187", ¶ 63).

[34] Had Weisman been aware of his right to a reduced schedule or intermittent leave, he would have been able to structure his leave in such a way so as to allow him to return to work within twelve weeks. (Exhibit "P-112", page 267, line 9 to page 268, line 11; Exhibit "P-187", ¶ 57). However, Weisman was not aware that he had such options. (Exhibit "P-112", page 267, line 24 to page 268, line 11; Exhibit "P-187", ¶ 57).

112", page 183, line 18 to page 184, line 13; page 185, lines 9-19); and (5) more assistance. (Exhibit "P-112", page 222, line 22 to page 223, line 4; Exhibit "P-187", ¶ 56).

None of these accommodations would have presented undue hardships to the Township; they were consistent with Township policies and procedures, and were not burdensome or costly to the Township, as they could have been accomplished with ease, with Weisman's tasks and responsibilities temporarily being performed by another Township employee. (Exhibit "P-187", ¶ 61). Quite simply, Stepnoski could have continued substituting for Weisman. (Exhibit "P-187", ¶ 61). In fact, Stepnoski admits that there was no reason he could not continue to substitute for Weisman while Weisman was on leave. Stepnoski admitted that there was nothing that prevented him from continuing to fill in for Weisman while Weisman was unable to work. (Exhibit "P-119", Part 1, page 89, line 15 to page 90, line 25; Exhibit "P-115", page 9, lines 11-14; page 10, lines 12-15; page 34, line 7 to page 35, line 2). He stated the following at his deposition:

> "Q:    And was there any reason why his leave that he was on through approximately March 1, 2003, could not be extended beyond March 1, 2003?
>
> A:    Other than being the manager of the township in a township that needed to be managed, he could not return to his job and the township needed a manager.
>
> Q:    Do you have any other reasons that you could articulate, as you are sitting here right now, why Mr. Weisman's leave could not be extended beyond March 1, 2003?
>
> A:    No.
>
> Q:    You were substituting for Mr. Weisman while he was on leave as township manager, right?

A:    That's correct.

Q:    And you were performing the job admirably; is that correct?

A:    Yes.

Q:    *Is there any reason why you could not continue in a substitute basis for Mr. Weisman while his leave was extended beyond March 1, 2003?*

A:    *No.*"

(Exhibit "P-115", page 8, line 19 to page 9, line 14)(italics added). This testimony is nothing short of an admission that the accommodation of a leave of absence could have and should have been provided.

Moreover, French testified at her deposition as follows:

"Q:    Mr. Stepnoski was an adequate and good substitute for Mr. Weisman; right?

A:    Appeared to be so.

...

Q:    Okay. So there was nothing that forced Mr. Weisman to be discharged effective March 1, 2003. *The township could have survived, and he could have been able to come back in April, May or June; right?*

A:    *On the basis of the township surviving, yes . . ..*"

(Exhibit "P-119", Part 1, page 90, lines 7-9, 19-23)(italics added).

Also, Cozza testified as follows at her deposition:

"Q:    *Can you articulate any reasons, as you sit here right now, why Mr. Weisman's leave could not have been extended as an accommodation as long as Mr. Stepnoski was substituting for him?*

A:    *No.*"

(Exhibit "P-120", page 58, lines 16-20)(italics added).

Additionally, Rowan testified as follows at his deposition:

31

"Q:    And you didn't think you had any other choice despite the fact that
Mr. Stepnoski was performing the job in an exemplary matter.  He was on
paid status at the time, and *he didn't give you any indication that he was
leaving; is that correct?*

A:    *He also did not give me any indication that he was staying.*"

(Exhibit "P-116", page 134, lines 2-8)(italics added).

As Stepnoski, Rowan, French and Cozza all testified at their depositions, there
was absolutely no reason that Stepnoski could not have continued working as Interim
Township Manager while Weisman was granted leave for his recovery after February of
2003.  As such, there is no material issue of fact regarding whether there would have
been an undue hardship by extending a leave to Weisman – the Defendants clearly
acknowledge that there would not have been.

Moreover, Weisman's psychologist indicated that Weisman was in fact able to
return to work at the end of March, 2003, a mere four weeks after Weisman was fired.
(Exhibit "P-105").  The Defendants' own expert does not refute the fact that Weisman
could return to work after March, 2003.  (Exhibit "P-183").

Clearly, for all of these reasons, Weisman was a qualified individual under the
ADA, qualified to and able to return to work with reasonable accommodations by the end
of March of 2003.

C.    **The Defendants' discharge of Weisman, failure to engage in the
interactive process and failure to provide reasonable accommodations
were adverse employment decisions resulting from unlawful
discrimination under the ADA and PHRA.**

The third prong of a prima facie case of discrimination under the ADA and PHRA
requires a showing of an adverse employment decision because of discrimination.  *Gaul,
supra.*  The ADA and PHRA prevent employers from firing an employee or otherwise

32

discriminating against that person because of his disability. *Shannon, supra.* Moreover, it is discriminatory for an employer to fail to engage in the interactive process with a disabled employee. The interactive process is a dialogue in which an employer and a disabled employee determine reasonable accommodations that would allow the employee to perform his job. It is likewise discriminatory for an employer to fail to offer reasonable accommodations to a disabled employee.

Disabled employees do have an obligation as part of the interactive process to request reasonable accommodations. "To request a reasonable accommodation, an employee need not mention the ADA or the phrase 'reasonable accommodation.'" *Taylor, supra* at 312-13. The EEOC guidelines echo this point, stating that to request accommodation, an individual may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation." *E.E.O.C. Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*, Addendum, page 21. The employee does not have an obligation or the burden to request a specific or reasonable accommodation. *Armstrong v. Burdette Tomlin Memorial Hospital*, 2006 WL 213850 (3d Cir. 2006). The employee need only inform the employer that he is disabled and request assistance. *Id.*

The EEOC's interpretative guidelines state that "[o]nce a qualified individual with a disability has requested provision of a reasonable accommodation, the employer **must** make a reasonable effort to determine the appropriate accommodation." 29 C.F.R. Pt. 1630, App. § 1630.9 at 359 (bold added). "Another reason for placing some burden on the employer is that . . . an employee with a mental illness may have difficulty effectively

relaying medical information about his or her condition, particularly when the symptoms

are flaring and reasonable accommodations are needed." *Taylor, supra* at 315.

> "Once the employer knows of the disability and the employee's desire for
> accommodations, it makes sense to place the burden on the employer to
> request additional information that the employer believes it needs.
> Disabled employees, especially those with psychiatric disabilities, may
> have good reasons for not wanting to reveal unnecessarily every detail of
> their medical records because much of the information may be irrelevant
> to identifying and justifying accommodations, could be embarrassing, and
> might actually exacerbate workplace prejudice.  An employer does not
> need to know the intimate details of a bi-polar employee's marital life, for
> example, in order to justify an accommodation such as temporary transfer
> to a less demanding position."

*Taylor, supra* at 315.

"The interactive process, as the name implies, requires the employer to take some

initiative."[35] *Taylor, supra* at 315.

The Court in *Taylor* stated the following:

> "The interactive process would have little meaning if it was interpreted to
> allow employers, in the face of a request for an accommodation, simply sit
> back passively, offer nothing, and then, in post-termination litigation, try
> to knock down every specific accommodation as too burdensome.  That's
> not the proactive process intended it does not help avoid litigation by
> bringing the parties to a negotiated settlement, and it unfairly exploits the
> employee's comparative lack of information about what accommodations
> the employer might allow.  In addition, in some cases courts may be better
> positioned to judge whether the employer met with the employee in good
> faith than to judge how burdensome a particular accommodation really
> is."

*Taylor, supra* at 315-316.

"All the interactive process requires is that employers make a good faith effort to

seek accommodations." *Taylor, supra* at 317.  Good faith can be demonstrated by

meeting with the employee, requesting information about the employee's condition and

---

[35] In *Dogmanits, supra* at *6, Judge Joyner stated the following:  "Upon learning of an employee's
disability, an employer has a duty to engage in a good faith interactive process with the employee to seek
reasonable accommodations."

limitations, and showing some signs of having considered the employee's request. *Taylor, supra* at 317. Even if reasonable accommodation is impossible, the employer is required to communicate this fact to the employee. *Taylor, supra* at 317.

The *Taylor* opinion further stated the following:

> "When an employee has evidence that the employer did not act in good faith in the interactive process, however, we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect. To assume that accommodation would fail regardless of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process.
> ...
> When the disability involved is one that is heavily stigmatized in our society--as is true when the employee is voluntarily or involuntarily committed to a mental institution--courts should be especially wary on summary judgment of underestimating how well an employee might perform with accommodations or how much the employer's bad faith may have hindered the process of finding accommodations."

*Taylor, supra* at 318.

The Third Circuit has set forth the requirements for proving failure of an employer to engage in the interactive process in *Taylor, supra*. The Third Circuit in *Taylor* stated the following:

> "To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith."

*Taylor, supra* at 319-320.

The *E.E.O.C. Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*, Addendum, page 25, states, in relevant part, the following:

"Permitting the use of accrued paid leave or providing additional unpaid leave for treatment or recovery related to a disability is a reasonable accommodation, unless (or until) the employee's absence imposes an undue hardship on the operation of the employer's business. This includes leaves of absence, occasional leave (e.g., a few hours at a time), and part-time scheduling."

Likewise, Department of Labor regulations state that the reasonable accommodation requirement may require an employer "to grant liberal time off or leave without pay when paid sick leave is exhausted and when the disability is of a nature that it is likely to respond to treatment of hospitalization." 29 C.F.R. pt. 32, app. A(b); *see also Wilson v. Lemington Home for the Aged*, 159 F.Supp.2d 186, 201 (W.D.Pa. 2001).

Making this same point in a case involving an attorney who had been discharged one week after being diagnosed with HIV, this Court stated, ". . . the defendants were obligated to permit the plaintiff to exhaust his sick and vacation days and then, if necessary, place him on a medical leave of absence until he could return to his former job or until the situation posed an undue hardship on [the Defendant employer] Hyatt." *Cain v. Hyatt,* 734 F.Supp. 671, 683 (E.D.Pa. 1990).

Depositions and written discovery have revealed that there is no dispute of fact as to any of the four prongs of the *Taylor* test. The Defendants knew about Weisman's disability, and Weisman requested accommodations for his disability. Weisman's initial December 30, 2002 letter to Cozza dealt with Weisman's most urgent issues concerning accommodations, supporting his family during this acute phase of his disability and having his leave properly calculated. (Exhibit "P-116", page 165, lines 18-22; Exhibit "P-119", Part 1, page 77, line 19 to page 78, line 22; Exhibit "P-119", Part 2, page 26, line 23 to page 28, line 16; Exhibit "P-115", page 16, line 14 to page 17, line 22; Exhibit "P-8" ; Exhibit "P-187", ¶ 41). Weisman requested that the Township comply with its

policies and practices as well as his employment contract and the law and afford him the leave time to which he was entitled. (Exhibit "P-8"; Exhibit "P-187", ¶ 41). The Defendants were made aware of Weisman's disability through this letter. (Exhibit "P-8"; Exhibit "P-187", ¶ 41). In that letter, Weisman requested properly calculated leave and the advancement of leave in order to accommodate his disability. (Exhibit "P-8"; Exhibit "P-187", ¶ 41). Specifically, this letter states, in relevant part, the following:

> "Secondly, the manner in which I have been treated by the Township and the corresponding statements made by Mr. Stepnoski in his letter, are in violation of the Township's practices and its contractual obligations to me. The violations include:
>
> 1. As you know, the Township allows employees to "borrow" up to two weeks of sick leave from future entitlement. The Township has not allowed me to exercise that right.
>
> ...
>
> In light of the foregoing, I request that I be afforded all of these benefits promptly and retroactively. *This leave is necessary to accommodate my disability.* All of my sick leave and other leaves, which the Township caused to be depleted with my last paycheck, should be restored.
>
> ...
>
> With respect to the notice that I am being placed on FMLA leave, I respectfully suggest that it is premature for me to be placed on FMLA leave. Under my employment contract and the practices of the Township, FMLA should not be triggered until after I have exhausted all other paid leaves to which I am entitled. In other words, my rights are being violated by the Township's decision to have FMLA leave run concurrent with the other leaves to which I am entitled."

(Exhibit "P-8")(italics added).

Clearly, this letter qualifies as a request for accommodations under the law expressed above, since it informed his employer that he was disabled and requested assistance. (Exhibit "P-8"; Exhibit "P-187", ¶ 41). *See Armstrong, supra.* Indeed, he expressly and explicitly asked for an accommodation in the form of a leave.

37

Moreover, the medical certification from Goebel, attached to the December 30, 2002 letter, suggested another possible accommodation of a part-time transition before resumption of full-time work. (Exhibit "P-8"). The certification states, in relevant part, the following:

> "[O]ften after recovery from a major mood illness, someone will require a relatively brief, limited period of transition back into work on a part-time basis, before resuming the stress of full-time duties. The extent to which he will need this and the duration of such a need will be determined as he recovers over the next several months."

(Exhibit "P-8"). The requests made in the letter and certification placed the Defendants on notice that Weisman was requesting accommodations due to his disability. (Exhibit "P-8"; Exhibit "P-187", ¶ 41).

As also required by the *Taylor* test, the Defendants did not make a good faith effort to assist Weisman in seeking accommodations. No action was ever taken by the Defendants to accommodate Weisman's known disability. (Exhibit "P-116", page 64, line 22 to page 65, line 1; Exhibit "P-119", Part 1, page 82, line 24 to page 83, line 9; Exhibit "P-115", page 17, lines 4-6; Exhibit "P-25"; Exhibit "P-187", ¶ 42). In fact, Weisman's requests for accommodations *admittedly* went unanswered by the Township and the Board. (Exhibit "P-116", page 64, line 22 to page 65, line 1; Exhibit "P-119", Part 1, page 82, line 24 to page 83, line 9; Exhibit "P-115", page 17, lines 4-6). As noted above, in *Taylor, supra*, the Court determined that the ADA or the term "reasonable accommodation" need not even be mentioned by an employee requesting accommodations for an employer's obligations under the ADA to be triggered. *Taylor, supra.* In this case, despite the fact that Weisman requested accommodations

38

specifically, the Defendants completely failed to engage in the interactive process or make any attempt to accommodate Weisman.

At her deposition, Defendant French not only acknowledged that the Township did not discuss providing Weisman with accommodations or engage in the interactive process, but also indicated that she considered Weisman's employment terminated by the end of December of 2002 or early January of 2003. Specifically, her testimony was as follows:

> "Q:    Okay. Well, when was it concluded – when did the township supervisors come to that conclusion and conclude that his employment had ended? When did that happen?
>
> A:    I can't put my finger on it. I'm not sure.
>
> Q:    Was it towards the end of December [of 2002] or early January [of 2003]?
>
> A:    It would have had to have been. Somewhere in that area.
>
> . . .
> Q:    *Did the township supervisors ever discuss providing Mr. Weisman with any accommodations?*
>
> A:    *Specifically, no.*
>
> . . .
> Q:    *Did you ever say to anybody anything like Max is disabled. We ought to be giving him any accommodations? Did you ever say that to anybody?*
>
> A:    *No.*
>
> . . .
> Q:    *Did any of the township's supervisors ever say in your presence that we should look at accommodations for Mr. Weisman?*
>
> A:    *Not that I recall.*
>
> Q:    *Are you aware of anyone in the township engaging in any interactive process with Mr. Weisman to discuss what his needs were and what accommodation he might be entitled to?*
>
> A:    *Not that I know of, no.*"

(Exhibit "P-119", Part 1, page 62, lines 17-23; page 81, line 25 to page 82, line 3; page

82, line 24 to page 83, line 3; page 83, lines 10-17)(italics added).

Moreover, Rowan testified as follows at his deposition:

"Q:    As you sit here today, *can you identify a single thing that the township supervisors did to have an interactive process with Max Weisman under the Americans with Disabilities Act?*

A:    *No.*"

(Exhibit "P-116", page 64, line 22 to page 65, line 1)(italics added).

Furthermore, Stepnoski testified as follows at his deposition:

"Q:    Okay.  So beginning in January of 2003, *when you found out that he had a disability, what was done to provide him with any accommodations?*

A:    *I don't know of any.*

Q:    Why weren't any accommodations considered or provided to Max Weisman?

MS. AYRES:  Objection to the form of the question.  You can answer.

A:    He never requested any.
...
A:    *Were there any meetings where the issue of providing accommodations to Mr. Weisman was ever discussed?*

A:    *I don't recall any.*

Q:    *Were there any meetings where the issue of his right to intermittent leave or reduced schedule leave was ever discussed?*

A:    *I don't recall.*"

(Exhibit "P-115", page 16, line 16 to page 17, line 1; page 17, line 23 to page 18, line

5)(italics added).

As required by *Taylor*, Weisman could have been reasonably accommodated but for Defendants' lack of good faith. Had an attempt to engage in the interactive process taken place, the Defendants would have discovered that Weisman's condition was improving and that by the end of March, 2003, Weisman would have been able to return to work on a full-time basis. (Exhibit "P-105"; Exhibit "P-132" ; Exhibit "P-187", ¶¶ 42, 63). In this case, the Defendants did nothing but sit back and wait for Weisman's FMLA leave to expire (as they calculated the end date) and terminate him. This is not an example of engaging in any good-faith effort to return Weisman to work as the interactive process requires of employers. Moreover, even if the Defendants did not think reasonable accommodation was possible, they did not even communicate this to Weisman as required by the law.

It is undisputed that the Township fired Weisman effective the end of February of 2003 because of his disability, but no Township employees or members of the Board informed Weisman during his FMLA leave that he would be fired if he did not return to work at the expiration of that leave. (Exhibit "P-112", page 257, line 20 to page 259, line 13; page 266, lines 21-23; Exhibit "P-187", ¶ 47).

The Township failed in its affirmative duty to take the initiative to engage in the interactive process with Weisman at any time between the time it became aware of his disability through receipt of Weisman's December 30, 2002 letter and his alleged February 28, 2003 termination. *See Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751 (3d Cir. 2004); *Taylor v. Phoenixville School District*, 184 F.3d 296, 315 (3d Cir. 1999). The Defendants cannot now argue, or create an issue of material fact, that Weisman could not have performed the essential functions of his job

with reasonable accommodations if they never bothered to even ask or attempt to determine what reasonable accommodations Weisman required.

In addition to discriminating against Weisman by failing to engage in the interactive process and failing to provide reasonable accommodations, the Defendants also discriminated against Weisman under the ADA by terminating his employment because he was disabled.   Rowan acknowledged this at his deposition, testifying as follows:

> "Q:    *And is that consistent with your testimony that the reason for his dismissal from employment had nothing to do with work performance but, in fact, was because of this non-work related disability?*
>
> A:    *Yes.*
> ...
> Q:    *What I said is accurate?*
>
> A:    *Yes.*
> ...
> Q:    And what was the explanation that Buckingham Township gave?
>
> A:    On the form [referring to an unemployment compensation form filed by the Defendants] it is written as claimant was unable to work due to non-work related disability.
>
> Q:    And it's your understanding that that's the reason for the separation?
>
> A:    Yes.
>
> Q:    And it's your understanding there were no other reasons for the separation other than that; is that correct?
>
> A:    That is correct."

(Exhibit "P-116", page 89, lines 2-6, 12-13; page 90, line 16-25)(italics added).

Stepnoski testified as follows at his deposition:

> "Q:    *Why was Max Weisman fired?*

A:   *He failed to return to his job.*

Q:   And why is that a basis for dismissal?

A:   He couldn't go to work.

Q:   *Is it your understanding that he was disabled?*

A:   *It is now, yes.*"

(Exhibit "P-115", page 8, lines 13-18)(italics added).

French's testimony is even more unbelievable and shows her utter ignorance of and contempt for the lawful leave rights of a public servant such as Weisman. French feels the need to disparage a mentally ill individual at a time when he was suicidal and in a partial hospitalization program because he was out of work for a month. According to her, he "deserted" his job. It is precisely this kind of thought process that Congress sought to prevent by enacting the ADA and the FMLA. French testified:

"Q:   . . . What were the reasons stated in any meetings or discussions by the supervisors as to why Max Weisman was fired or don't you recall?

A:   I don't recall sitting there and saying, well, for what reasons. What I know is the impact on me – that we had been deserted, and we had 30 days of that or thereabouts, very close to it without word at all. I don't know that there is a job in the world where somebody walks away for 30 days. It would have been unthinkable in any employment, I think, to just assume that –

Q:   Okay. Let me make sure I understand what you are saying. I think you are saying a couple things in response to my question as to what did my supervisors discuss as to the reasons. I think, A, you are saying you don't recall any discussion as to what the supervisors' reasons for dismissal were. And, B, I think you are also saying, as far as you're concerned because he was out for 30 days and you use the word abandoned his job that was why you voted to discharge him; is that correct?

A:   Was certainly – it was a substantial piece of it. You can be so sick on a job – and I have been there – that you can barely get in the door, and if you can't call yourself to say I can't make it, you get someone else to do

43

it for you.  And I think the higher your – the greater your responsibilities
not only for yourself on the job, but for all the people who are part of your
department, who in some way look to you for guidance, direction, to that
extent, if you can't do it yourself, you turn to somebody else and let them
know."

(Exhibit "P-119", Part 1, page 29, line 5 to page 30, line 11).

Further, in contesting Weisman's claim for unemployment compensation, the
Township stated the following as the reason for Weisman's discharge: "Claimant was
unable to work due to non-work related disability."  (Exhibit "P-84"; Exhibit "P-86").  In
other words, the Defendants fired Weisman because of his disability.  Cozza admitted as
much at her deposition, at which she testified as follows:

"Q:    … Now, is your understanding that Mr. Weisman was disabled as
a result of a mental illness; right?

A:    Yes.

Q:    In fact, you argued he was unable to work as a result of his
disability; right?  In the unemployment comp proceedings you made that
argument at least three different times; right?

A:    Yes.

Q:    Is that correct?

A:    Yes."

(Exhibit "P-120", page 123, line 25 to page 124, line 10).  This is a plain violation of
*Shannon, supra*, which indicates that *the ADA prevents employers from firing an
employee* or otherwise discriminating against that person *because of his disability*.
*Shannon, supra.*

For all of these reasons, judgment should be entered on behalf of Weisman on
Counts III and V of the Amended Complaint.

II.  **JUDGMENT SHOULD BE ENTERED ON BEHALF OF WEISMAN ON COUNT VII OF PLAINTIFF'S AMENDED COMPLAINT BECAUSE WEISMAN'S CONTRACTS WITH THE TOWNSHIP WERE VALID, AS THE DEFENDANTS CANNOT DISPUTE THEIR VERBAL APPROVAL OF THE CONTRACTS, AND THE DEFENDANTS BREACHED THESE CONTRACTS AND/OR COMMITTED PROMISSORY ESTOPPEL.**

Weisman negotiated agreements with the Board regarding his employment as Township Manager. (Exhibit "P-112", page 52, lines 6-20; Exhibit "P-187", ¶¶ 17, 18, 19, 20). He submitted to the Board a written employment agreement and a written severance agreement reflecting the agreements made. (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to page 67, line 23; page 86, lines 23-24; Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-184"; Exhibit "P-187", ¶ 18). The Township and Weisman negotiated and agreed to the terms of the agreements. (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to page 67, line 23; Exhibit "P-116", page 58, line 25 to page 59, line 25; Exhibit "P-187", ¶¶ 18, 19). These agreements were not signed by the Board. (Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-187", ¶ 20). However, the Board assured Weisman of its approval of the contracts. (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to page 67, line 23; Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-187", ¶¶ 19, 20, 22, 24). Further, the conditions of Weisman's employment contract were put into place after Weisman was officially appointed to the position of Township Manager in July of 2000. (Exhibit "P-112", page 58, line 11 to page 59, line 18; Exhibit "P-187", ¶ 23).

Importantly, none of the Defendants put forth any testimony or evidence during discovery proceedings to contradict that there were effective and binding employment and severance agreements between Weisman and the Township. (Exhibit "P-115", page 52, lines 16-19; page 52, line 23 to page 53, line 5; page 54, lines 11-21; Exhibit "P-119", Part 1, page 72, line 20 to page 73, line 1; page 73, lines 7-11; page 73, line 18 to page

74, line 3; page 76, lines 17-18; page 76, line 23 to page 78, line 2; Exhibit "P-115", page 89, lines 16-17; page 89, line 21 to page 90, line 4).  French testified that as far as she knew, the employment agreement appeared to be an accurate reflection of what was agreed to by Weisman and the Board.  (Exhibit "P-119", Part 1, page 72, line 20 to page 74, line 3).  French also testified that she was not familiar with the severance agreement and did not know if she had seen it when Weisman was Township Manager.  (Exhibit "P-119", Part 1, page 76, line 17 to page 78, line 2).  Rowan testified that he did not recall Weisman's severance agreement, or discussion of his employment agreement, and that he had no recollection to either agree or disagree with Weisman's testimony about the details of Weisman's employment and severance agreements.  (Exhibit "P-116", page 52, line 16 to page 54, line 21).  Stepnoski testified that he did not know why Weisman was not paid the severance payments.  (Exhibit "P-115", page 89, line 16 to page 90, line 6).

The Township breached the employment and severance agreements in a number of respects.  Specifically, it did not compensate Weisman under the short-term disability provisions of his employment agreement.  (Exhibit "P-6", ¶ 5(a); Exhibit "P-187", ¶¶ 67(b), 69).  Additionally, the Township did not allow Weisman to use his compensatory time for the hours he worked above and beyond regular business hours when he became ill, in violation of his employment agreement.  (Exhibit "P-6", ¶ 7(b); Exhibit "P-187", ¶ 67(c)).

Moreover, the Defendants did not compensate Weisman in accordance with his severance agreement, failing to pay Weisman a lump sum of one-half his salary as provided in the severance agreement.  (Exhibit "P-7", ¶ 5(a); Exhibit "P-187", ¶ 67(d)).  Further, the Township failed to pay for health care coverage for Weisman and his family

for six months following discharge as provided in his severance agreement. (Exhibit "P-7", ¶ 5(c); Exhibit "P-187", ¶ 67(e)). The Township opposed Weisman's proceedings to secure unemployment compensation and provided more than just financial information to the Department of Labor and Industry, Bureau of Unemployment Compensation, in violation of the terms of the severance agreement. (Exhibit "P-7"; Exhibit "P-84"; Exhibit "P-87"; Exhibit "P-89"; Exhibit "P-88"; Exhibit "P-120", page 123, line 25 to page 124, line 10; Exhibit "P-187", ¶ 67(f)).

In addition to these breaches of specific agreements between Weisman and the Township, the Township violated Township policies. Specifically, the Township failed to provide Weisman with short-term disability benefits or other monetary benefits during his leave pursuant to Township policies. (Exhibit "P-17"; Exhibit "P-92"; Exhibit "P-187", ¶¶ 42, 50). Moreover, the Township and the Board did not pay Weisman any disability benefits during his leave even though the Board had previously approved the provision of disability insurance to Township employees. (Exhibit "P-112", page 218, line 22 to page 219, line 3; page 243, lines 2-15; page 245, lines 12-14; Exhibit "P-115", page 37, lines 22-25; page 72, line 5 to page 73, line 17; Exhibit "P-187", ¶¶ 42, 50).

"The essence of a contract is mutual assent . . .. The general rule is that an enforceable contract requires that there be mutual assent upon all the material and necessary terms." *Rich v. Hoseiry Corp of America,* 1990 WL 902462, at *409 (Pa.Com.Pl. 1990), *affirmed*, 599 A.2d 709 (Pa.Super. 1991), *appeal denied*, 607 A.2d 255 (Pa. 1992). A signed, written agreement is not necessary to state a claim for breach of contract. *Rich, supra.* An oral agreement can be found depending on the circumstances surrounding the parties' words and actions. *Rich, supra.* "The general

rule is that the terms of an oral agreement are to be construed from the words and conduct of the parties." *Rich, supra* at 415.

Further, an oral agreement may be enforceable and legally binding without a writing. *Kazanjian v. New England Petroleum Corp.*, 480 A.2d 1153 (Pa.Super. 1984). "Where parties have reached an oral agreement, the fact that they intend to reduce the agreement to writing does not prevent enforcement of the oral agreement." *Kazanjian, supra* at 1157. *See also, Ketchum, et al. v. Conneaut Lake Co.* 163 A. 534, 535 (Pa. 1933); *Springer v. Springer,* 386 A.2d 122, 124 (Pa.Super. 1978).

This Court has stated the following regarding oral contracts:

> ". . . [T]he fact that the parties intended to memorialize their agreement in writing does not mean that the parties did not have an oral agreement or that they intended to be bound *only* by writing. . . .. *Luber v. Luber*, 418 Pa.Super. 542, 548, 614 A.2d 771, 773 (1992) ('Where the parties have reached an oral agreement, the fact that they intend to reduce the oral agreement to writing does not prevent enforcement of the oral agreement.'); *Compu Forms Controls, Inc. v. Altus Group, Inc.*, 393 Pa.Super. 294, 305, 574 A.2d 618, 624 (1990) ('As we have recognized, if the parties agree on essential terms and intend them to be mutually binding, a contract is formed even though the parties intend to adopt a formal document later which will include additional terms.'); *see also* Pennsylvania Bar Institute, *Pennsylvania Suggested Standard Civil Jury Instructions* § 15.01 (1991) ('If you find that an oral contract existed in this case, it is irrelevant that the party seeking to enforce the contract did not take steps to obtain a written contract, despite his or her apparent ability and opportunity to do so.').""

*Robert Billet Promotions, Inc. v. IMI Cornelius, Inc.*, 1998 WL 721081, at *12 (E.D. Pa.).

The aforementioned breaches are indisputable, and the Defendants do not and cannot deny that the employment and severance agreements were binding and enforceable contracts. The actions of the Township in naming Weisman to the position of Township Manager, and putting into place a number of provisions of the oral agreements, are evidence of the Township's intention to be bound contractually. (Exhibit

"P-112", page 56, line 19 to page 59, line 9; Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-119", Part 1, page 74, lines 4-10; Exhibit "P-187", ¶¶ 16, 23).

The Amendment to Township Ordinance Number 57 *requires* the Township to have an employment contract with the Township Manager.[36] (Exhibit "P-116", page 53, lines 6-15; Exhibit "P-2"; Exhibit "P-5").   Specifically, this Amendment states, in relevant part, the following: "He [the Township Manager] shall receive no other compensation from the Township other than that set forth in that certain Contract for Employment between the Township and the Manager executed from time to time as deemed necessary by the Township." (Exhibit "P-2"; Exhibit "P-5").

The Township and Weisman negotiated and agreed to the terms of the agreements. (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to page 67, line 23; Exhibit "P-116", page 58, line 25 to page 59, line 25; Exhibit "P-187", ¶¶ 17, 18, 19, 20). Weisman submitted to the Board a written employment agreement and a written severance agreement. (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to page 67, line 23; page 86, lines 23-24; Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-185"; Exhibit "P-187", ¶ 18).

Weisman testified as follows at his deposition:

"Q:   If you would turn to the next page, Paragraph 27 says: Weisman was informed that the supervisors agreed with the employment agreement and the severance agreement and that the employment agreement and the severance agreement would be signed after the new solicitor had an opportunity to review them.  Do you see that paragraph?

A:   Yes, I do.

---

[36] The Township Manager prior to Weisman had an employment contract with the Township. (Exhibit "P-116", page 129, line 25 to page 130, line 10).  Weisman was paid and received benefits in accordance with the agreements after the Board publicly appointed him Township Manager. (Exhibit "P-112", page 58, line 11 to page 59, line 18; Exhibit "P-187", ¶ 23).

Q:      And who informed you that the Supervisors agreed with it?

A:      They did.

Q:      And when did they do that?

A:      Do you want the date?

Q:      If you can't give me the date, then an approximate time frame is fine.

A:      It was at the end of June.

Q:      Was it during a public meeting?

A:      No.

Q:      When – was it in an executive session?

A:      Yes.

Q:      Who else was present?

A:      The Board and myself.

Q:      And what specifically can you tell me about the conversation?

A:      Well, as the previous paragraph said, that we had been – we had been talking about the terms of my employment and my severance. So, the actual terms of the agreements have been previously agreed to, and this was just a matter of looking at the final documents, having them review them, and which they did. And then they said the documents were fine, that they had agreed to the documents that were presented.

Q:      Okay.  You said the terms had been previously agreed to.  I thought this Paragraph 27 is at that executive session is when you were first told that they agreed to them, but then you're saying there was a prior agreement?

A:      No.  There were specific terms in the contract that were negotiated.

Q:      Okay.

A:      So, if we reached an agreement as to one term of the contract, the whole contract isn't agreed to, but that term is agreed to.

50

Q:     Okay.

A:     For example, salary, something like that.

Q:     Okay.  So, at this executive session, is this – is this executive session that you talked about in response, in relation to this Paragraph 27, is that when you were told by the Supervisors that the agreements were acceptable?

A:     Yes.

Q:     Okay.  But some of the terms had been already negotiated to come to that point?

A:     All the terms had been already negotiated to come to that point.

Q:     What were the terms that had to be negotiated?  What were some of the sticking points?

A:     I don't know that I would characterize anything as a sticking point. Basically, all the terms of the contract, salary, benefits, severance agreement, amount of compensation upon severance.  They weren't sticking points per se."

(Exhibit "P-112", page 53, line 4 to page 55, line 23).

Moreover, the Board assured Weisman of its approval[37] of the contracts.  (Exhibit "P-112", page 36, lines 10-16; page 52, line 6 to 67, line 23; Exhibit "P-6"; Exhibit "P-7"; Exhibit "P-187", ¶¶ 19, 20, 22, 24).  Weisman testified at his deposition as follows:

"Q:     In Paragraph 29 of the amended complaint it says: Between June and December you were regularly assured by the Supervisors and the

---

[37] At his deposition, the Township solicitor, Craig Smith, denied that the Board approved the contracts, but he acknowledged that he was not always present at Board meetings or parts of Board meetings where the contracts may have been discussed.  (Exhibit "P-121", page 33, lines 22-24; page 34, lines 7-21; page 37, line 18 to page 38, line 18; page 44, line 16 to page 45, line 14; page 46, line 20 to page 47, line 2). Moreover, a January 6, 2002 email from Craig Smith to Weisman indicates that Weisman's employment contract was ready for signature by the Board, but signature was delayed only because the Township Manager ordinance had to be changed first and the Board delayed acting on this.  (Exhibit "P-185"; Exhibit "P-184").

solicitor that the terms were acceptable and that the written contracts would be signed. Do you see that paragraph?

A:      Yes.

Q:      And when were you assured?   When were you given those assurances?

A:      Throughout that time period.

Q:      Every day, at public meetings?  What were the –

A:      No. It wasn't every day and it wasn't on a specific – at a specific event like a public meeting.  It came up periodically throughout this time frame."

(Exhibit "P-112", page 59, line 19 to page 60, line 10).

The conditions of Weisman's employment contract were put into place after Weisman was officially appointed to the position of Township Manager in July of 2000.[38]

(Exhibit "P-112", page 58, line 11 to page 59, line 18; Exhibit "P-187", ¶ 23).  For example, French testified as follows at her deposition:

"Q:      Okay.  On page one [of the employment agreement], the last sentence says that the township agrees to employ Weisman as its township manager commencing July 1, 2000.  Is that your recollection as to when he began as township manager?

A:      I only know from what I see here.  I don't have the – I simply don't have it by dates.  I don't believe it's wrong."

(Exhibit "P-119", Part 1, page 74, lines 4-10).

Weisman testified as follows at his deposition:

"Q:      Okay.  In Paragraph 28 [of the Amended Complaint] you list some of the terms that were included in the employment agreement?

---

[38] These conditions include (1) salary; (2) use of a Township vehicle; (3) pension plan provisions; (4) the Township's payment of relevant dues and subscriptions; (5) the Township's payment of continuing education classes; (6) implementation of a life insurance policy; and (7) vacation time.  (Exhibit "P-6"; Exhibit "P-187", ¶ 23).

A:     Right.

Q:     Do you see that?  Are you familiar with the fact that the Township has a township manager ordinance?

A:     Yes.

Q:     Can you tell me what terms, if any, listed here were new terms or new conditions that you were including in your agreement that were otherwise not a part of the Township manager position?

A:     As per the ordinance?

Q:     Or otherwise, I mean.

A:     I am sorry, I still don't understand.  I am not trying to be difficult.

Q:     No, it's all right.  Let's talk about this.  First of all it says: Weisman was named Township manager.  His salary was paid in accordance with the terms of the contract.  As Township manager, if you had a contract or you didn't have a contract, did you get a salary?

A:     I would assume so, yes.

Q:     Well, you didn't have a contract when you first were given the interim Township manager position; right?

A:     No, but this contract went into effect when I assumed the Township manager position on a full-time basis.

Q:     Okay.

A:     So, I don't know what would have happened if I had assumed it without a contract.

Q:     Okay.

A:     And I might add, the salary when I – the salary in the contract was probably atypical in terms of what a Township manager would have been paid when they started a position.

Q:     What do you mean atypical?

A:     Well, there was an additional salary component that was paid because I was performing two functions prior to this, interim Township manager and finance director.

Q:      Okay.

A:      So, that was part of the – that was part of the contract that probably another Township manager in their contract would not have had."

(Exhibit "P-112", page 57, line 9 to page 59, line 9).

At their depositions, the Supervisors did not deny that the contracts are accurate reflections of what was agreed to by Weisman and the Board!  (Exhibit "P-116", page 52, line 16 to page 54, line 21; Exhibit "P-119", Part 1, page 72, line 20 to page 74, line 3; page 76, line 17 to page 78, line 2; Exhibit "P-115", page 89, line 16 to page 90, line 6). Specifically, Rowan testified as follows at his deposition:

"Q:      Do you recall that there was discussion that there is going to be employment contract with Max Weisman and that the ordinance needed to sanctify such a concept as an employment contract with the township manager?
...
A:      I don't recall.

BY MR. LEVIN:      You don't recall one way or another?

A:      Yes, sir.

Q:      You mean yes, sir, you don't recall one way or the other?

A:      I do not recall one way or the other.
...
Q:      Do you recall that there was going to be a severance agreement with Max Weisman?

A:      No.

Q:      One way or the other you don't recall?

A:      One way or the other I don't recall.

Q:      So, if Max Weisman were to testify as to his recollection of what the specific compensation, fringe benefit and severance agreement was going to be, you don't have any recollection to either agree or disagree with him; is that correct?

A:     That is correct."

(Exhibit "P-116", page 52, lines 16-19; page 52, line 23 to page 53, line 5; page 54, lines

11-21).

French testified as follows at her deposition:

"Q:     With respect to the statements on this employment agreement, am I
correct that they correctly represent what the township supervisors agreed
to pay Max Weisman?

A:     I'd really have to go back saying this.  I have not followed
personnel issues that closely.

Q:     So you don't know one way or the other; is that correct?

...

THE WITNESS:     I don't know.

BY MR. LEVIN:     So it's possible this accurately reflects what the
township supervisors agreed to?

...

THE WITNESS:     I'm just trying to think how to answer most
truthfully.  I can't see any reason for it, for anyone to have created a
document that doesn't reflect inappropriate.

BY MR. LEVIN:     As far as you're concerned, it appears to be accurate
reflection of what was agreed to by the parties?

A:     Insofar as I know.

Q:     Excuse me?

A:     Insofar as I know, yes.

...

Q:     Are you familiar with the fact that there was a severance
agreement with Max Weisman?

...

A:     I'm not familiar with that.

Q:     One way or the other?

A:     No.

Q:     Is that correct?

A:     That's correct.  I'm not familiar.  Either way.  I don't know.

Q:     Was it your understanding that the township manager was entitled to all the same benefits as other non-uniformed employees of the township?

A:     Not clearly.

Q:     What do you mean by that?

A:     The whole area unfortunately possibly of personnel relations, et cetera, I really have not followed it.
(Four-page severance agreement marked Plaintiff's Exhibit-7, for identification.)

BY MR. LEVIN:     I show you what has been marked as Plaintiff's Exhibit-7, which is a severance agreement.  When was the first time you saw this document?

A:     I don't know.

Q:     Was it about the same time you saw the employment document that had been marked Plaintiff's Exhibit-6?

A:     I really can't tell you on these.  I have not – I never study them.  I never discussed them.

Q:     Would you agree with me that you did see it when Mr. Weisman was township manager?

A:     I don't know.  I just – I'm drawing a blank on these things."

(Exhibit "P-119", Part 1, page 72, line 20 to page 73, line 1; page 73, lines 7-11; page 73, line 18 to page 74, line 3; page 76, lines 17-18; page 76, line 23 to page 78, line 2).

Stepnoski testified as follows at his deposition:

"Q:     Is there any reason why the payments called for in the severance agreement were not provided to Mr. Weisman?
…
A:     I was not a supervisor, so I have no authority over –

BY MR. LEVIN:     So you don't know.  You don't know what the reason was for not paying the severance payments?

A:     No.

Q:     Is that correct?

A:     That's correct."

(Exhibit "P-115", page 89, lines 16-17; page 89, line 21 to page 90, line 4).

The Township breached the employment and severance agreements in a number of respects. Specifically, it did not compensate Weisman under the short-term disability provisions of his employment agreement. (Exhibit "P-6"; Exhibit "P-187", ¶ 67(b)). Paragraph 5(a) of the agreement states the following:

> "a) The Township agrees to put in force and make the required premium payments for the Township Manager, for an insurance policy providing 24 hour coverage for occupation related and non-occupation related, temporary and permanent disability income benefits, including residual benefits, with no expiration. Said disability policy shall provide 100% income replacement for short term coverage *i.e.* up to six months and 65% income replacement for long term coverage *i.e.* periods beyond six months. Said policy shall also be noncancelable and be guaranteed renewable, with cost of living provisions included."

(Exhibit "P-6", ¶ 5(a)). However, the Township did not put into place the disability provisions in Weisman's contract. (Exhibit "P-187", ¶ 67(a)).

Additionally, the Township did not allow Weisman to use his compensatory time for the hours he worked above and beyond regular business hours when he became ill, in violation of his employment agreement. (Exhibit "P-6", ¶ 7(b); Exhibit "P-187", ¶ 67(c)). Specifically, paragraph 7(b) of the employment contract states the following:

> "b) The Township recognizes that the Township Manager is an exempt employee under the Fair Labor Standards Act and may devote a great deal of time outside normal office hours to the business of the Township. Therefore, the Township Manager will be allowed to take compensatory time off as he shall deem appropriate."

(Exhibit "P-6", ¶ 7(b)).

Moreover, the Defendants did not compensate Weisman in accordance with his severance agreement, failing to pay Weisman a lump sum of one-half his salary as provided in the severance agreement. (Exhibit "P-7", ¶ 5(a); Exhibit "P-187", ¶ 67(d)). Paragraph 5(a) of the severance agreement states the following:

". . . [T]he Township agrees to provide the following upon Weisman's termination as Township Manager of Buckingham Township:

a) The Township will pay Weisman a lump sum cash payment equal to six months of Weisman's then current salary. In addition to the foregoing, for every year of employment or portion thereof beyond the first five years of employment, additional severance will be paid at a rate of one month's salary per every year worked, or any portion thereof. The total of the base severance payment of six months salary plus any incremental severance payment resulting from more than five years of employment shall not exceed a total of twelve months of Weisman's of Weisman's salary."

(Exhibit "P-7", ¶ 5(a)).

Moreover, the Township failed to pay for health care coverage for Weisman and his family for six months following discharge as provided in his severance agreement. (Exhibit "P-7", ¶ 5(c); Exhibit "P-187", ¶ 67(e)). Specifically, paragraph 5(c) of the severance agreement states the following:

"c) The Township will pay for healthcare coverage for Weisman and his family for six months following his termination; after the expiration of the six-month period, Weisman will assume responsibility for payment of any healthcare coverage under COBRA."

(Exhibit "P-7", ¶ 5(c)).

The Township opposed Weisman's proceedings to secure unemployment compensation and provided more than just financial information to the Department of Labor and Industry, Bureau of Unemployment Compensation, in violation of the terms of the severance agreement. (Exhibit "P-7"; Exhibit "P-82"; Exhibit "P-83"; Exhibit "P-

84"; Exhibit "P-86"; Exhibit "P-87"; Exhibit "P-89"; Exhibit "P-120", page 123, line 25 to page 124, line 10; Exhibit "P-187", ¶ 67(f)).   Specifically, paragraph 5(d) of the severance agreement states the following:

> "d) The Township agrees not to participate or otherwise oppose any proceedings to secure unemployment compensation for Weisman, and further agrees if contacted for information regarding the circumstances of Weisman's termination, to provide only financial information to the Department of Labor and Industry, Bureau of Unemployment Compensation."

(Exhibit "P-7", ¶ 5(d)).

However, in contesting Weisman's claim for unemployment compensation, the Township indicated the following as the reason for Weisman's discharge: "Claimant was unable to work due to non-work related disability."   (Exhibit "P-89"; Exhibit "P-90").

Further, Cozza testified as follows at her deposition:

> "Q:    ... Now, is your understanding that Mr. Weisman was disabled as a result of a mental illness; right?
>
> A:    Yes.
>
> Q:    In fact, you argued he was unable to work as a result of his disability; right?   In the unemployment comp proceedings you made that argument at least three different times; right?
>
> A:    Yes.
>
> Q:    Is that correct?
>
> A:    Yes."

(Exhibit "P-120", page 123, line 25 to page 124, line 10).

In addition to breach of contract, the Township has violated the equitable theory of promissory estoppel.   In order to maintain an action in promissory estoppel, a plaintiff must show that 1) the defendant made a promise that it should have reasonably expected

to induce action or forbearance on the part of the plaintiff; 2) the plaintiff actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise. *Crouse v. Cyclops Industries*, 745 A.2d 606, 611 (Pa. 2000).

In this case, the Board made a promise to Weisman by informing him that they agreed with the provisions set forth in the employment agreement and severance agreement. (Exhibit "P-120", page 52, line 21 to page 54 line 14; Exhibit "P-187", ¶¶ 19, 20, 22, 24). By expressing their verbal agreement and appointing Weisman to the position of Township Manager at a public meeting, the Defendants should have reasonably expected that Weisman would accept the position of Township Manager. Weisman accepted the position of Township Manager in July of 2000 in justifiable reliance on the assertion that his employment and severance agreements were acceptable to the Supervisors. (Exhibit "P-187", ¶ 25). In accepting and holding the position of Township Manager, Weisman: (1) reasonably believed that the employment agreement and severance agreement were acceptable to the Defendants and enforceable contracts; and (2) declined to pursue other employment opportunities or the potential opportunity of remaining in his position as Finance Director of the Township. The elements of promissory estoppel have thus been proven by Weisman.

Moreover, the elements of promissory estoppel are established based on the Township's failure to pay Weisman disability benefits pursuant to Township policy. The Defendants acknowledge that the Township had a self-insured short-term disability policy, and that it had been previously used by at least one other Township employee, Corporal Robert Moller. (Exhibit "P-119", Part 1, page 56, line 10 to page 58, line 5).

The Township's disability policy at the time, provided by January 27, 2003 letter from the Defendants' attorney at the time, states, in relevant part, the following:

"SHORT-TERM DISABILITY LEAVE BENEFIT

| | |
|---|---|
| *Policy Statement:* | The Township provides a self-sponsored short-term disability leave benefit for all full-time employees. |
| *Definitions:* | The Township provides a self-sponsored short-term disability leave benefit in the amount of 60% of pre-disability average income for non-service related illnesses or injuries." |

(Exhibit "P-17"; Exhibit "P-92").  The Township violated this policy by not providing Weisman with short-term disability benefits.  Rowan acknowledged at his deposition that the Township had a short-term disability plan, and that the staff, and not the Board, decides whether an employee qualifies for it.  (Exhibit "P-116", page 91, lines 17-25; page 96, line 17 to page 97, line 4).

As with the employment and severance agreements, Weisman assumed the position of Township Manager with the reasonable belief that the disability policy applied to all employees, including him.  He declined to remain Finance Director or pursue other employment opportunities based partly on this reasonable belief that he would receive disability benefits if he qualified for them.  Injustice can be avoided only if the Township is ordered to pay these benefits to Weisman.  The elements of promissory estoppel are thus met regarding the Township's violation of its disability policy.

For all of these reasons, Weisman requests that the Court find that the Township violated Weisman's binding employment and severance agreements and Township policies.  Further, Weisman requests that the Court order the Township to compensate him fully as indicated by the letter and the spirit of these agreements and policies.

Judgment should be entered on behalf of Weisman on Count VII of the Amended Complaint.

## III. JUDGMENT SHOULD BE ENTERED ON BEHALF OF WEISMAN ON COUNT X OF PLAINTIFF'S AMENDED COMPLAINT BECAUSE THE DEFENDANTS FAILED TO TERMINATE WEISMAN'S EMPLOYMENT BY TAKING AN AFFIRMATIVE VOTE OF THE BOARD AT A PUBLIC MEETING, IN VIOLATION OF THE SECOND CLASS TOWNSHIP CODE.

Weisman was fired effective March 1, 2003. However, the Defendants made that decision in private and never took any public vote to approve or effectuate the firing. As a result of the Defendants' failure to take public action, the dismissal is invalid and Weisman is entitled to back pay and reinstatement.

The Defendant Township is organized as a Township of the Second Class pursuant to Pennsylvania law, subject to the Second Class Township Code[39]. 53 P.S. § 65101, *et seq.* (Exhibit "P-187", ¶ 3). The Second Class Township Code requires the following:

> "The board of supervisors shall meet for the transaction of business at least once each month at a time and place determined by the board of supervisors. A quorum is two members of a three member board of supervisors and three members of a five member board of supervisors. *An affirmative vote of a majority of the entire board of supervisors at a public meeting is necessary in order to transact any business.*[40] A member of the board shall not be disqualified from voting on any issue before the board solely because the member has previously expressed an opinion on the issue in either an official or unofficial capacity."

---

[39] The Defendants have admitted that they are subject to the Second Class Township Code. (Exhibit "P-126", ¶ 139; Exhibit "P-47", ¶ 139).

[40] French testified during her deposition that "as far as I know, any vote taken must be done in public and must be available as part of a public record." (Exhibit "P-119", Part 1, page 15, lines 18-20). However, French also testified that certain actions by the Board, such as approving benefits to be paid to certain employees from time to time, were not taken at a public meeting after a public vote. (Exhibit "P-119", Part 1, page 49, line 20 to page 50, line 13).

53 P.S. §65603 (emphasis added).   The Commonwealth Court of Pennsylvania has interpreted this statute to require a vote at a public meeting for the termination of Township employees.   *Thomas v. Township of Cherry, Butler County,* 722 A.2d 1150 (Pa.Cmwlth. 1999).

In *Thomas,* the plaintiff received a letter signed by two members of the board of supervisors informing him that he was dismissed from his position as roadmaster. *Id.* at 1151. The plaintiff alleged that the two members met without public notice and that their actions dismissing him did not occur at a public meeting, thus violating the Second Class Township Code. *Id.* at 1151-2.   The plaintiff sought reinstatement with full salary and benefits until the time when the Board properly dismissed him. *Id.* at 1152.   The Court found that "the Board members' actions did not comport with section 603 because the decision made by the two members was not transacted at a public meeting with the requisite public notice." *Id.* at 1154.   Further, the Court opined, [w]hat actually took place has all the earmarks of a secret meeting, the result of which was foisted upon the public." *Id.* at 1154.

No vote terminating Weisman, the highest ranking employee of the Township, was ever made at a public meeting. (Exhibit "P-116", page 21, lines 10-18; page 145, lines 7-15; Exhibit "P-119", Part 2, page 19, line 23 to page 20, line 16; Exhibit "P-115", page 59, line 23 to page 60, line 15; Exhibit "P-187", ¶ 75). *The Defendants admit that they never voted to terminate Weisman's employment at a public meeting.* (Exhibit "P-150 and "P-151", Request for Admission and Response Number 35). The Board has done nothing to date at any public meeting since 2003 to ratify its unlawful vote to terminate Weisman's employment. (Exhibit "P-116", page 21, lines 10-18; page 145,

lines 7-15; Exhibit "P-119", Part 2, page 19, line 23 to page 20, line 16; Exhibit "P-115", page 59, line 23 to page 60, line 15; Exhibit "P-187", ¶ 75).

Much like in *Thomas, supra,* the Board apparently conducted a secret meeting and foisted the resulting termination upon the public. (Exhibit "P-115", page 11, line 9 to page 13, line 13). This action, acknowledged by the Board, is precluded by the Second Class Township Code. This "action" taken by the Board is void. *See Thomas, supra* at 1155. The Supervisors cannot recall if the alleged vote was even done at an executive session, which is not a public meeting. (Exhibit "P-116", page 21, lines 2-18; Exhibit "P-119", page 18, lines 11-13, 20-21).

The only remedy that would make Weisman whole, as suggested by the *Thomas* Court, is reinstatement to his former position with back pay and benefits. For all of these reasons, judgment should be entered on behalf of Weisman on Count X of the Amended Complaint.

## CONCLUSION

For all the reasons set forth above, the Plaintiff, Max Weisman, respectfully requests that this Honorable Court grant his Motion for Partial Summary Judgment as to his claims of discrimination under the ADA and PHRA, his claim of breach of contract and/or promissory estoppel and his claim that the Defendant Township violated the Second Class Township Code.

Respectfully submitted,
LEVIN LEGAL GROUP, P.C.

Michael I. Levin, Esquire
Stacy G. Smith, Esquire
Joshua B. Axelrod, Esquire
1301 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
(215) 938-6378
*Counsel for Plaintiff*

Dated: 8/16/06

65

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Plaintiff's Motion for Partial

Summary Judgment, Memorandum of Law in Support of Motion for Partial Summary

Judgment, and Proposed Order were served, on this day, via First Class Mail upon:


David Maselli, Esquire
Susan Ayres, Esquire
Wright & O'Donnell, P.C.
15 East Ridge Pike, Suite 570
Conshohocken, PA 19428

*Attorneys for Defendants*

                                          LEVIN LEGAL GROUP, P.C.

                                          Michael I. Levin, Esquire
                                          Stacy G. Smith, Esquire
                                          Joshua B. Axelrod, Esquire
                                          1301 Masons Mill Business Park
                                          1800 Byberry Road
                                          Huntingdon Valley, PA 19006
                                          (215) 938-6378
                                          *Counsel for Plaintiff*

Dated:   8/16/06